IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

DARRELL E. SMITH,

      Petitioner,

v.                                Case No. 2:14-cv-18928

PATRICK A. MIRANDY, Warden,
St. Mary's Correctional Center,

      Respondent.


**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Petitioner Darrell E. Smith's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1), Petitioner's Motion to Amend Original Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, (ECF No. 43), and Respondent's Motion for Summary Judgment, (ECF No. 24).  By Standing Order entered on May 7, 2014, and filed in this case on July 9, 2014, this action was referred to United States Magistrate Judge Cheryl A. Eifert for submission of proposed findings and recommendations for disposition.  (ECF No. 4). On January 29, 2016, the Court entered an order vacating the referral of this action to Magistrate Judge Eifert and stating that the Court would preside over this case.  (ECF No. 47).

I.      **Relevant Facts and Procedural History**

    **A. Indictment, Trial, and Direct Appeal**

In June 2007, Petitioner Darrell E. Smith ("Petitioner") was indicted by a Kanawha County, West Virginia grand jury on twelve sex offenses against three of his granddaughters: N.S., A.L.S.,

and B.S.[1]  (ECF No. 24-1, Ex. 15 at 1–7).  The first six counts concerned N.S., and those counts alleged: Petitioner committed first-degree sexual assault by digitally penetrating N.S. when she was younger than twelve years old (Count One); Petitioner sexually abused N.S. while acting as her parent, guardian, or custodian by digitally penetrating her (Count Two); Petitioner committed first-degree sexual abuse by touching N.S.'s breasts when she was younger than twelve years old (Count Three); Petitioner sexually abused N.S. while acting as her parent, guardian, or custodian when he touched her breasts (Count Four); Petitioner committed first-degree sexual abuse when he forced N.S. to touch his penis (Count Five); and Petitioner sexually abused N.S. while acting as her parent, guardian, or custodian when he forced N.S. to touch his penis (Count Six).  (*Id.* at 2-5).  Counts Seven and Eight related to A.L.S. and alleged that Petitioner had sexually abused A.L.S. by touching her breasts.  (*Id.* at 5-6).  The final four counts involved B.S., and the indictment alleged: Petitioner committed first-degree sexual abuse by forcing B.S. to touch his penis when she was less than twelve years old (Count Nine); Petitioner sexually abused B.S. while acting as her parent, guardian, or custodian when he forced B.S. to touch his penis (Count Ten); Petitioner committed first-degree sexual abuse by touching B.S.'s "female sex organ" when she was less than twelve years old (Count Eleven); and Petitioner sexually abused B.S. while acting as her parent, guardian, or custodian when he touched her "female sex organ" (Count Twelve).  (*Id.* at 6-8).  Prior to Petitioner's trial, the State offered to allow Petitioner to plead guilty to Counts Three, Seven, and Eleven in exchange for dismissal of the remaining counts.  (ECF No. 42-1 at 2).  However, no plea agreement was reached, and Petitioner proceeded to trial.  Before trial commenced, Counts One, Three, Five, and both counts pertaining to A.L.S. were dismissed upon motion of the State. (ECF No. 24-1, Ex. 16 at 1).

---

[1] Given the sensitive subject matter of this case, the Court uses the initials of any alleged victims and their parents to protect their identities.

Petitioner's trial began on July 22, 2008. He was represented by Gail Michelson and Diana Panucci from the Kanawha County Public Defender Office. (ECF No. 24-2, Ex. 17 at 3). During a break in jury selection, the trial judge expressed dissatisfaction with defense counsel when Petitioner exited the courtroom to use the public restroom. (*Id.* at 151–52). The trial judge was concerned that Petitioner was "mingling in the restroom with the jurors." (*Id.* at 152). Defense counsel pointed out that some potential jurors were still present in the courtroom when the court's admonishment occurred and requested that the trial judge instruct the jury on judicial impartiality. (*Id.* at 151–52). The trial judge agreed to defense counsel's request, and during initial instructions, she informed the jury that she did not favor either side and that the jury should not let any of her mannerisms, tone of voice, or rulings influence their decision making. (*Id.* at 165).

As its first witness, the State called B.S., who was fourteen years old at the time of trial. (ECF No. 24-2, Ex. 17 at 185). During questioning by the prosecuting attorney, B.S. testified that she was no longer close to Petitioner because he had hurt her and her two sisters. (*Id.* at 189). When asked how Petitioner had hurt her, B.S. responded that he "molested [her] and [her] two sisters, [N.S.] and [A.L.S.]." (*Id.* at 189). Defense counsel immediately asked to approach the bench, where they objected to B.S.'s mention of A.L.S. (*Id.* at 190). Defense counsel argued that the jury should not have been told of A.L.S.'s alleged abuse and moved for a mistrial. (*Id.*) The prosecuting attorney suggested in the alternative that the court instruct the jury to disregard B.S.'s testimony about A.L.S.; however, defense counsel rejected that proposal, fearing that any further mention of A.L.S. would only compound the error. (*Id.*) Ultimately, the court denied defense counsel's motion for a mistrial, concluding that any prejudice could be cured by having the prosecuting attorney confirm with B.S. that her knowledge was limited to her own contacts with Petitioner. (ECF No. 24-2 at 192–93). In addition, the court offered to provide a cautionary

instruction.   When questioning resumed, B.S. admitted that she only possessed personal knowledge of Petitioner abusing her.  (*Id.* at 193–94).  B.S. reiterated that Petitioner had molested her by touching her in inappropriate ways and forcing her to touch him.  (*Id.* at 195).  She explained that the abuse occurred in Petitioner's bedroom at the home where Petitioner and B.S.'s grandmother lived in Dunbar, West Virginia.  (*Id.* at 194).  B.S. further testified that the abuse took place while she was in Petitioner's bed and her grandmother was in another room.  (*Id.* at 195–96).  She recounted telling a friend, J.L., about the abuse during a sleepover and subsequently informing her middle school counselor about it in November 2005, after J.L threatened to tell an adult if B.S. did not do so.  (*Id.* at 198–99, 207).  B.S. stated that the abuse began "a couple of years" before she told her friend about it and that it repeatedly happened over that period.  She indicated that she did not tell anyone because she was afraid of what Petitioner might do if she told someone.  (ECF No. 24-2, Ex. 17 at 198–99).  When asked about the last time Petitioner had inappropriately touched her, B.S. testified that Petitioner touched her approximately one or two weeks before she spoke with her counselor, when she was eleven years old. (*Id.* at 203).  B.S. also indicated that the last time Petitioner forced her to touch him was also when she was eleven years old.  (*Id.* at 204).  On cross-examination, B.S. admitted that she told police during a January 2006 interview that the last time Petitioner touched her was in July 2005.  (*Id.* at 207). B.S. further admitted that she first volunteered information about being abused after J.L. disclosed that she had been molested by her father.  (*Id.* at 207–08).

The State next called N.S., who was seventeen years old at the time of trial.[2]  (ECF No. 24-2, Ex. 17 at 214–15). In November 2005, N.S. learned that her younger sister, B.S., had reported that Petitioner was abusing her.  (*Id.* at 218).  When N.S. heard about B.S.'s allegations, she felt

---

[2] By the time of trial, N.S. was married and her last name had changed. For the purpose of continuity, the Court will use N.S. throughout this opinion.

guilty because she also had been abused by Petitioner but had never told anyone. (*Id.*)  N.S. testified that Petitioner touched her breasts and vaginal area when she would spend the night at his home. (*Id.* at 218–19).  Petitioner would also have N.S. touch his penis with her hands and her mouth. (*Id.* at 220).  She recalled seeing Petitioner ejaculate. (*Id.*)  She first reported this abuse to her mother on the same day that B.S. came forward. (ECF No. 24-2, Ex. 17 at 221).  N.S. testified that Petitioner last touched her breasts and vagina in the summer of 2005 and that she last touched Petitioner's penis a few months before then. (*Id.*)  N.S. also recalled that Petitioner digitally penetrated her between the ages of twelve and fourteen. (*Id.* at 222).  On cross-examination, N.S. conceded that she had told police in January 2006 that she never had oral sex with Petitioner; however, she explained that she did not want to tell the police about the oral sex because her mother was in the room with her during the interview. (*Id.* at 225).  N.S. also testified on cross-examination as to other locations where Petitioner accosted her.  Specifically, N.S. recalled that Petitioner attempted to have sexual intercourse with her at Campbell's Creek when she was thirteen or fourteen years old and at attorney Walt Wagner's office when she was thirteen years old. (*Id.* at 227–28). With respect to the instances that occurred at Petitioner's home, N.S. revealed that she had been abused almost every time she visited Petitioner's home since she was five or six years old. (*Id.*)

The State's third witness was Bob Love, who was acquainted with Petitioner through church, but did not know him well. (ECF No. 24-2, Ex. 17 at 236, 230).  Mr. Love recalled having a conversation with Petitioner at church; however, he could not recall when the conversation took place. (*Id.* at 237).  During that conversation, Mr. Love asked how Petitioner was doing, and Petitioner replied that he was broke because he had to hire a lawyer. (*Id.*).  Petitioner added: "They told me they forgave me. And if they forgave me, why am I going through this?" (*Id.*)  Mr.

Love also testified that Petitioner questioned why his case was not closed if they forgave him.  (*Id.* at 238).

The State's final witness was A.S., who is the mother of B.S. and N.S., and also Petitioner's daughter-in-law. (ECF No. 24-2, Ex. 17 at 242). A.S. recounted that the principal at B.S.'s school called and asked to meet with A.S. in November 2005. (*Id.* at 243–44).  When A.S. arrived at the school, she met with the principal, school counselor, and B.S.  (*Id.* at 245).  B.S. then told A.S. about Petitioner abusing her.  (*Id.*)  When A.S. returned home, she took N.S. aside and asked her whether she had anything to say about Petitioner.  (*Id.* at 245–46).  N.S. began to cry and revealed that Petitioner had abused her.  (*Id.* at 246).  A.S. also testified that members of their church, which was also attended by Petitioner, learned of the allegations and began to call her children liars. (ECF No. 24-2, Ex. 17 at 248).  A.S. was asked about the defense's claim that A.S. had pressured her daughters to concoct a story against Petitioner because he had offered to pay for his son to divorce A.S.  (*Id.* at 251–52).  A.S. denied ever hearing about Petitioner's divorce offer to her husband and denied encouraging B.S. and N.S. to fabricate a story against Petitioner.  (*Id.*)  A.S. further testified that, once the allegations against Petitioner surfaced, A.S. did not let her daughters go over to Petitioner's home if Petitioner was present.  (*Id.* at 255).

The defense's first witness was Walt Wagner, Jr., who was Petitioner's close friend for approximately thirty years.  (ECF No. 24-3, Ex. 18 at 13–14).  Mr. Wagner testified that he practiced law and consulted with Petitioner about the case, but never charged him any money.  (*Id.* at 13, 15). He also stated that Petitioner was truthful and would never lie under oath. (*Id.* at 14).

Petitioner's second witness was Jesse Forbes, a family friend of Petitioner's for over twenty years.  (*Id.* at 16).  Mr. Forbes, who was also an attorney, testified that he and his father agreed to represent Petitioner for free, but eventually had to cease their representation based on the amount

6

of work that Petitioner's case entailed. (*Id.* at 16–17). Mr. Forbes indicated that he believed Petitioner did not contact any attorneys about his case other than Mr. Wagner and the Kanawha County Public Defender Office. (*Id.* at 18). Mr. Forbes also remarked that Petitioner was a "very truthful person." (*Id.* at 16).

The defense next called Tracy Handley, Petitioner's niece. (ECF No. 24-3, Ex. 18 at 21–22). Ms. Handley testified that she spoke with N.S. sometime after N.S. reported the abuse and that N.S. became upset during that conversation because she did not want Petitioner to go to jail. (*Id.* at 25). According to Ms. Handley, N.S. also stated that Petitioner "didn't do anything." (*Id.*) When Ms. Handley attempted to speak with N.S.'s and B.S.'s father, J.S., about the conversation, J.S. stated that it was "too . . . late." (*Id.* at 26). Ms. Handley explained that she did not disclose N.S.'s statements to the police because she had already informed N.S.'s father about them. (*Id.*)

Staci Kirk, the wife of Petitioner's nephew, also testified on behalf of Petitioner. (ECF No. 24-3, Ex. 18 at 31). Ms. Kirk was called to provide evidence in support of the defense's theory that N.S. and B.S. lived in a home environment where they were exposed to highly sexualized conversation and stimuli, which caused them to imagine sexual abuse at the hands of their grandfather. Ms. Kirk testified that, sometime after November 2005, she was present in A.S. and J.S.'s home and witnessed them discussing sexual topics and displaying sex toys in front of their children, including N.S. and B.S. (*Id.* at 33–36).

The defense's fifth witness was Yvonne Whitlock, Petitioner's sister-in-law. (ECF No. 24-3, Ex. 18 at 38–39). Ms. Whitlock testified that A.S. and her children were present at Petitioner's house on several occasions after November 2005. (*Id.* at 42). Ms. Whitlock also recalled that Petitioner's grandchildren would go to lunch with him after the abuse allegations surfaced. (*Id.*) Ms. Whitlock remembered specifically seeing A.S. and her children with Petitioner

7

at a Shoney's restaurant in Dunbar.  (*Id.*)  She stated that "[f]or almost a full year [after the allegations were made], you would not have known anything had changed, which concerned [her]."  (*Id.* at 43).  In addition, Ms. Whitlock asserted that A.S. and J.S. had sexually-oriented discussions in front of their children and left sexually explicit materials out around their home, which their children could see.  (*Id.*)

Petitioner next called the pastor at A.S.'s and Petitioner's former church, Mark Thaxton. (ECF No. 24-3, Ex. 18 at 51).   Reverend Thaxton testified that he had known A.S. for approximately six years and spoke with her at every church service.  (*Id.* at 52)  He opined that A.S. was not credible and that he would not believe her testimony.  (*Id.* at 53).  He also recalled seeing A.S. and her children at the same restaurant as Petitioner after the allegations were made in November 2005.  (*Id.* at 63).  However, Reverend Thaxton did not observe Petitioner interact with N.S. or B.S.  (*Id.*)  Finally, Reverend Thaxton mentioned that his church provided money and food to A.S.'s family when B.S. was diagnosed with lymphoma.  (*Id.* at 54).  Defense counsel moved to introduce church ledgers into evidence to show the contributions that the church made to A.S's family and to impeach A.S.'s testimony that church members were hostile toward A.S. and her family. The court denied the motion, finding the ledgers to be irrelevant and confusing.  (*Id.* at 58). The court explained that the ledgers offered by the defense related to a period of time before November 2005, when the allegations were made, while A.S.'s testimony concerned the behavior of the church members after the allegations surfaced.  (*Id.*)

Petitioner's seventh witness was Nancy Saunders, Petitioner's sister.  (ECF No. 24-3, Ex. 18 at 64–65).  Ms. Saunders testified that A.S. and J.S. often talked about sex in front of their children.  (*Id.* at 66)  She also remembered seeing an adult movie lying on the table in A.S. and J.S.'s home, which their children would have been able to observe.  (*Id.* at 66).

Next, Petitioner testified on his own behalf. (ECF No. 24-3, Ex. 18 at 80). Petitioner denied ever improperly touching his granddaughters. (*Id.* at 84, 88). Petitioner asserted that he would sometimes come home from work to find his granddaughters in his bed, but he would make them leave the room when he went to bed. (*Id.* at 86). On some occasions, Petitioner would wake up to find his granddaughters had crawled into bed with him and his wife. When that occurred, Petitioner would leave the room. (*Id.* at 87). Petitioner also testified that he did not move to Dunbar until 1998, and as such, any assertion by N.S. that he abused her at his Dunbar home beginning when she was five or six years old could not be true, since she would have been eight years old in 1998. (*Id.* at 87–88). Moreover, Petitioner stated that N.S. could not have seen him ejaculate because he suffered from erectile dysfunction. (*Id.* at 84). In addition, Petitioner noted that A.S. and J.S. permitted Petitioner to be around their children, or invited him to be around their children, on several occasions after November 2005. (*Id.* at 82, 91). Petitioner recalled that he had offered to pay for a divorce for J.S. twice, with the last offer being made in A.S.'s presence "right before" B.S. and N.S. came forward with their allegations. (*Id.* at 90). With respect to Mr. Love's testimony, Petitioner did not remember having any conversation with Mr. Love about the case or hiring a lawyer. (*Id.* at 88, 105). In fact, Petitioner only spoke with Mr. Wagner and Mr. Forbes before seeking representation from the public defender's office. (*Id.* at 88–89).

On cross-examination, Petitioner maintained that he had not had an erection in over six years. (ECF No. 24-3, Ex. 18 at 95). Petitioner asserted that he went to a doctor for his erectile dysfunction several years before trial and that he was going to be prescribed medication for his condition, but he did not have insurance to help pay for treatment. (*Id.* at 96). When Petitioner was asked whether he possessed any medical records to support his claim of erectile dysfunction, defense counsel objected and argued that the question shifted the burden of proof to the defense.

(*Id.*)  The trial court overruled the objection, and Petitioner indicated that the doctor he saw for his condition had since died.  (*Id.* at 96–97).  Petitioner also stated that a doctor in Spring Hill might have his medical records, but he had not treated with that doctor in approximately six years.  (*Id.*)  In addition, Petitioner opined that B.S. and N.S. had imagined the allegations against him based on "stuff they've been around and seen on TV."  (*Id.* at 98).  Petitioner also testified that A.S. had encouraged B.S. and N.S. to fabricate the allegations against him. (*Id.* at 102).

The defense's final witness was Fred J. Krieg, Ph.D., a licensed clinical and school psychologist.  (ECF No. 24-3, Ex. 18 at 110–11).  Dr. Krieg's testimony focused on the interviews that B.S. and N.S. underwent prior to trial.  Dr. Krieg began with an interview of B.S. conducted by Jeff Sprouse, an employee at the West Virginia Department of Health and Human Resources ("DHHR"), on November 7, 2005.  (*Id.* at 113, 123).  Reviewing a transcript of the interview, Dr. Krieg testified that the interview lasted approximately twenty minutes and that A.S. was present during the interview, which Dr. Krieg opined "discounts [an] evaluation." (*Id.* at 123).  Dr. Krieg additionally faulted Mr. Sprouse for failing to use open-ended questions during the interview and for making judgmental statements about Petitioner. (*Id.* at 120–22).

Next, Dr. Krieg discussed an interview of B.S. conducted by a Dunbar police officer on January 28, 2006.  (ECF No. 24-3, Ex. 18 at 123).  Dr. Krieg noted that the interview was only six minutes long and that A.S. was again present.  (*Id.*)  During the interview, the police officer asked whether Petitioner's wife (B.S.'s grandmother) knew about the abuse, and B.S. replied, "I don't know exactly because like my mother says, she may have known because there were these situations with my uncle." (*Id.* at 124).  Dr. Krieg found that the use of the phrase "like my mother says" was evidence that B.S. was "coached." (*Id.*)  Dr. Krieg pointed out other phrases in the transcript that he felt were evidence of coaching by B.S.'s mother.  Moreover, he noted that in this

statement B.S. claimed that Petitioner forced her to touch his penis, although she never mentioned that fact at the November 2005 interview. (*Id.* at 125–26).

Turning to Mr. Sprouse's November 2005 interview of N.S., Dr. Krieg noted that the interview lasted approximately twenty minutes and that A.S. was present. (ECF No. 24-3 at 128). At that interview, N.S. informed Mr. Sprouse that Petitioner would "try to touch [her]" when she went to bed and that it happened more than once. (*Id.* at 138). Dr. Krieg went through the statement with the jury, pointing out sections that he felt were indicative of poor interviewing technique, repeating his criticisms of Mr. Sprouse for using leading questions and for failing to ask appropriate follow-up questions. (*Id.* at 137, 140–41).

Dr. Krieg next summarized an interview of N.S. performed by a Dunbar police officer on January 28, 2006, which was six minutes in length. (*Id.* at 144). During that interview, N.S. informed the officer that Petitioner touched her breasts and vagina, and asked her to have sex with him. (*Id.*) N.S. elaborated that Petitioner would digitally penetrate her, but she denied having oral sex with Petitioner. (*Id.* at 145). N.S. also stated that Petitioner gave her wine coolers while the two were at Campbell's Creek and tried to have sex with her. In addition, N.S. recounted Petitioner touching her breasts at Mr. Wagner's office and asking her to have sex. (ECF No. 24-3 at 146). When asked by the officer about the last time that she was abused, N.S. indicated that it happened in July when she was fourteen years old. (*Id.* at 145). N.S. recalled that Petitioner forced her to touch his penis, and he subsequently ejaculated on her face and breasts. (*Id.*) Dr. Krieg testified that N.S.'s failure to mention the ejaculation during her interview with Mr. Sprouse made little sense given the traumatic nature of the event. (*Id.* at 147). Ultimately, Dr. Krieg opined that none of the interviews given by B.S. and N.S. were valid or reliable because of "the inconsistencies, the

differences in the two interviews, the limited amount of time, [and] the lack of qualification of the interviewers."[3]  (*Id.*)

On cross-examination, Dr. Krieg conceded that he was not aware of the details of the initial disclosures that B.S. made to her friend, her counselor, and her mother.  (ECF No. 24-3 at 149–50).  Dr. Krieg also admitted that he did not know the contents of the first conversation that N.S. and her mother had regarding the abuse.  (*Id.* at 153).  In addition, Dr. Krieg acknowledged that an interviewee may still be telling the truth even if the interview method is unreliable.  (*Id.* at 148). However, Dr. Krieg opined that N.S. failing to report significant details during her first interview made her statement at the second interview "highly suspect and not believable."  (*Id.* at 154).  On the other hand, Dr. Krieg admitted it was possible that N.S. was too embarrassed to mention the episode during her first interview with her mother present.  (*Id.* at 156).  When asked about the length of the interviews, Dr. Krieg acknowledged that the more children are questioned, "the more it hurts," and thus, he "would rather kids not be questioned hundreds of times."  (ECF No. 24-3, Ex. 18 at 153).  On the subject of coaching, Dr. Krieg asserted that if B.S. was not directly coached, she "overheard enough that she was unable to then give [a statement] as if it was hers." (*Id.* at 169). Dr. Krieg also recognized that at least one alleged inconsistency between N.S.'s interviews identified on direct examination was not apparent from the interview transcripts as the answer during the first interview was inaudible.  (*Id.* at 162–63).  Finally, Dr. Krieg conceded that he could not comment on the veracity of B.S.'s and N.S.'s testimony because he was not present for their testimony.  (*Id.* at 178).

The State called one rebuttal witness, J.S., the father of B.S. and N.S. (ECF No. 24-3, Ex. 18 at 188).  J.S. testified that there was not a highly sexualized atmosphere in the home where B.S.

---

[3] The interviews discussed by Dr. Krieg were marked for identification purposes at trial, but were not introduced as evidence.

and N.S. resided.  (*Id.* at 189).  J.S. denied that sex toys or pornography were lying around the home out in the open.  (*Id.* at 190).  He also stated that he would not allow his children to be exposed to such things.  (*Id.*)  In addition, J.S. did not recall Petitioner offering to pay for a divorce in front of A.S. (*Id.* at 192).  Finally, J.S. indicated that he spoke with Mr. Love two or three weeks before trial and that Mr. Love informed him about the conversation between Petitioner and Mr. Love. (*Id.* at 193).  Mr. Love relayed that Petitioner had said the children forgave him, and so, he did not know why they were still pursuing charges against him.  (*Id.*)  Mr. Love also told J.S. that Petitioner had reported having to spend money on lawyers for his case.  (*Id.* at 196).

Petitioner also testified on rebuttal.  (ECF No. 24-3, Ex. 18 at 200).  Petitioner again stated that he could not remember having a conversation with Mr. Love.  (*Id.* at 201).  Additionally, Petitioner specifically remembered discussing his offer to pay for his son's divorce from A.S. while in her presence.  (*Id.* at 202).  At that time, Petitioner was angry with A.S. "[b]ecause of the way she was treating [J.S.] and the kids." (*Id.*)

Before final instructions were given to the jury, the trial court and the parties discussed the numbering of the verdict form.  Defense counsel argued that the numbering of the counts on the verdict form as they appeared in the indictment implied that there were additional counts against Petitioner, since certain counts had been dismissed prior to trial.  (ECF No. 24-3, Ex. 18 at 219–20).  As such, defense counsel requested a verdict form that did not list count numbers.  (*Id.* at 220).  The court opined that an unnumbered verdict form would be difficult, because the jury instructions that were previously approved by the parties referenced the counts as numbered in the indictment and the jury would need to be able to differentiate between the counts.  (*Id.*)  The trial court observed that "it's not unusual that we go forward on counts that are not numbered the same in cases . . .  I think it can be cured by just explaining to the jury not to be concerned about the

numbers." (*Id.* at 222).  Defense counsel agreed that an instruction to the jury would solve the problem. (*Id.*)

During final jury instructions, the Court instructed the jury that "[t]he indictment in this case is only an accusation or charge against the defendant, and is not evidence of guilty whatsoever. The Court also instructs the jury that you should draw no inference from the numbering of the counts contained in the indictment and you should utterly disregard the numbering of those counts." (ECF No. 24-4, Ex. 19 at 16).  The trial court also reminded the jury that any remarks by the court during trial were not evidence and that the court had no opinion as to the facts of the case. (*Id.* at 17).  In addition, the court stressed to the jury on a number of occasions that the burden of proof rested on the State. (*Id.* at 22, 25, 28, 31, 33, 35–38, 40).  After closing arguments and deliberations, the jury found Petitioner guilty on all counts (five counts of sexual abuse by a custodian and two counts of first-degree sexual abuse).  (*Id.* at 88–89).  On November 13, 2008, the trial court entered an order sentencing Petitioner to ten to twenty years' imprisonment on each of Counts Two, Four, Six, Ten, and Twelve. (ECF No. 24-4, Ex. 20 at 96–97). The trial court also sentenced Petitioner to one to five years' imprisonment on Counts Nine and Eleven. (*Id.* at 97). The sentences for Counts Two, Four, and Six were to run consecutively, while the remaining sentences were to run concurrently.  (*Id.* at 96–97).

On June 9, 2009, Petitioner filed a petition for appeal with the Supreme Court of Appeals of West Virginia ("WVSCA").  In his petition, Petitioner raised two issues:

> 1. The trial court erred by ruling that West Virginia law does not permit pretrial taint hearings when [Petitioner] presented evidence that the child witnesses' pretrial statements to authorities were the product of suggestive questioning and intentional coaching.
>
> 2. The trial court erred by not granting a mistrial when a prosecution witness introduced 404(b) evidence that the State and defense agreed would not be mentioned at trial involving counts of the indictment that were dismissed.

(*Id.*, Ex. 21 at 103-04).  The WVSCA granted the petition for appeal on September 3, 2009.  (*Id.*,

Ex. 22 at 144).  On May 6, 2010, the WVSCA issued an opinion affirming Petitioner's conviction.

(ECF No. 24-6, Ex. 25 at 29–52); *State v. Smith*, 696 S.E.2d 8 (W. Va. 2010).  With respect to

Petitioner's second ground for appeal, the WVSCA concluded that:

> Our review of this matter does not indicate any abuse of discretion by the circuit
> court, nor do we find that the circuit court acted in an arbitrary or irrational manner
> in denying the appellant's motion for a mistrial. The appellant's assertion that the
> jury could not move past B.S.'s brief and unsolicited comment is not supported by
> the record. During a two-day trial, the prosecution presented significant evidence
> of the appellant's abhorrent behavior toward his two granddaughters. . . .
>
> The appellant has failed to show a manifest necessity for a mistrial as there is no
> evidence of prosecutorial overreaching. Moreover, the appellant specifically
> declined a curative instruction at the end of the trial. As this Court has held, "[t]he
> determination of whether 'manifest necessity' that will justify ordering a mistrial
> over a defendant's objection exists is a matter within the discretion of the trial court,
> to be exercised according to the particular circumstances of each case."  Given the
> flexibility afforded trial judges in this area, there is no evidence that the circuit court
> abused its discretion in denying the appellant's motion for a mistrial.

*Smith*, 696 S.E.2d at 17–18 (quoting Syl. Pt. 3, *Porter v. Ferguson*, 324 S.E.2d 397 (W. Va. 1984)).

Thereafter, Petitioner sought a writ of certiorari from the United States Supreme Court, which the

Supreme Court denied on November 8, 2010.  *Smith v. West Virginia*, 562 U.S. 1034 (2010).

### B. State Habeas Proceedings

On December 27, 2010, Petitioner filed his first *pro se* petition for a writ of habeas corpus

in the Circuit Court of Kanawha County. (ECF No. 16-1, Ex. 2 at 4–9, Ex. 14 at 67).[4]  Therein,

Petitioner alleged three grounds for relief: (1) "Court was bias and allowed the victim to enter

court with teddy bear as well as talk to [Petitioner] in a disrespectful manner in front of jury"; (2)

---

[4] Petitioner's state habeas filings have been entered on the docket as exhibits to ECF Nos. 16 and 24.  (*See*
ECF Nos. 16-1, 24-6.)  The Court's citation to these documents will employ the pagination provided in the
ECF header.   The trial transcript (exhibits 17–19), which has been docketed as ECF Nos. 24-2, 24-3, and
24-4, will be cited according to the internal transcript pagination.

"Insufficient Counsel[.] Counsel was not ready for jury trial[,] was not clear on alternative plea agreement, as well as jury trial arguments"; and (3) "Witnesses coached[.] Clearly the state coach witnesses and lead in questioning."  (ECF No. 16-1, Ex. 2 at 7) (*sic* throughout).  On March 16, 2011, the circuit court denied the petition because Petitioner "failed to establish a basis for the relief requested . . . ." (*Id.*, Ex. 3 at 11). In particular, with respect to Petitioner's "insufficient counsel" claim, the circuit court dismissed the claim without prejudice on the ground that Petitioner had failed to provide factual support for his claim. (*Id.* at 12).  As to the other two claims contained in the petition, the circuit court concluded that those claims were not cognizable in a state habeas corpus proceeding.  (*Id.* at 13). The circuit court noted in its order that a hearing on the petition was not justified based on its contents.  (*Id.*)

On April 19, 2011, Petitioner filed a second *pro se* state habeas petition, this time under the WVSCA's original jurisdiction.  (ECF No. 16-1, Ex. 4 at 16–21).  In this petition to the WVSCA, Petitioner raised four grounds for relief: (1) the circuit court failed to hold an evidentiary hearing and appoint counsel to represent Petitioner in his habeas proceeding; (2) the trial judge displayed bias against Petitioner in front of the jury by telling Petitioner he was not permitted to shake his head during the trial and "jump[ing] on [him]" for going to the restroom; (3) counsel was not ready for trial and failed to call witnesses to prove that "the victim" was lying; and (4) "the judge allowed a teddy bear to be brought in the courtroom by the victim during [the] victim's testimony." (*Id.* at 19–20). On September 8, 2011, the WVSCA entered an order refusing to issue the writ.  (*Id.* at 23).

Petitioner filed his third *pro se* state habeas petition on September 28, 2011, in the Circuit Court of Kanawha County.  (ECF No. 16-1, Ex. 6 at 25–31). This time, Petitioner alleged the following seven grounds for relief: (1) the trial court erred by allowing "the victim" to enter the

16

courtroom holding a teddy bear; (2) trial counsel were not ready for jury trial and "did not try to impeach the witnesses"; (3) "Witness lied by/of location[.] The truth could have been brought out by her father because they lived in Ohio when she was 5, 6, 7 years of age"; (4) "Witness #1 lied"; (5) N.S. lied to the Department of Health and Human Resources and the police; (6) B.S. "lied when asked about how long she had been at [Petitioner's] house"; and (7) the trial judge acted improper when she "chastised [Petitioner] in front of the jury on three occasions." (*Id.*, at 28, 31). The circuit court denied Petitioner's third state habeas petition by order entered October 28, 2011. (*Id.*, Ex. 7 at 33–35). The circuit court's order mistakenly stated that Petitioner had raised only three grounds for relief in the petition. (*Id.* at 34). The circuit court again dismissed Petitioner's ineffective assistance of counsel claim without prejudice based on Petitioner's lack of factual support for the claim. (*Id.*) In addition, the circuit court declined to hold a hearing on the petition given the lack of meritorious arguments contained in the petition. (*Id.* at 35).

On August 23, 2012, Petitioner filed a fourth *pro se* state habeas petition in the Circuit Court of Kanawha County. (ECF No. 16-1, Ex. 10 at 41–57). In his petition, Petitioner raised eight grounds for relief:

1. Court erred by not allowing critical evidence to impeach key witness;

2. Court erred by allowing witness to testify with a "teddy bear" in hand;

3. Court erred by not renumbering the jury verdict form;

4. Ineffective Assistance of Trial Counsel:

    A. Counsel failed to impeach critical witnesses;

    B. Counsel failed to investigate or perform certain pretrial functions;

    C. Counsel did not properly advise [Petitioner] as to a plea;

    D. Counsel failed to use important evidence or testimony at trial;

E. Counsel did not object to teddy bear being carried into courtroom;

F. Counsel was unprepared for jury trial;

G. Counsel failed to submit jury instructions to show the character of [Petitioner];

5. Improper Bias and Conduct of Judge:

A. Judge showed bias towards defendant;

B. Prejudicial statements were made by trial judge in front of jury;

C. Judge would not allow [Petitioner] to speak to his lawyer and reprimanded in front of jury;

6. The instructions given to the jury should have included that the character alone could stand as given by the Supreme Court;

7. Parts of the trial procedure were done under "discussion held off record" violating [Petitioner's] rights;

8. Ex Post Facto Statute: Greater Punishment.

(*Id.* at 47–48) (*sic* throughout) (some punctuation added or changed). With respect to his plea bargain claim, Petitioner asserted that defense counsel called Petitioner while he was at work to discuss a potential plea bargain. (*Id.* at 53). However, Petitioner was unable to speak with defense counsel about the plea offer at that time because it was the busiest part of his workday. (*Id.*) According to Petitioner, defense counsel insisted that Petitioner "answer immediately" and called him three times within an hour requesting an answer. (*Id.*) Petitioner "just answered 'no' without understanding the complete plea agreement." (*Id.*) Petitioner alleged that, had the plea offer been "explained appropriately," he "may have accepted" it. (*Id.*) As for Petitioner's claim that trial counsel failed to properly investigate his case before trial, Petitioner faulted his counsel for failing to obtain medical records that supported his claim of impotency. (*Id.*)

On May 7, 2013, the circuit court entered an order dismissing Petitioner's fourth state

habeas petition.  (ECF No. 16-1, Ex. 11 at 59–60).  The circuit court recognized that Petitioner asserted eight grounds in his petition, but found that all of the issues had been previously addressed in Petitioner's prior state habeas proceedings. (*Id.* at 59). Consequently, the circuit court dismissed the petition with prejudice. (*Id.*) Petitioner appealed the circuit court's order to the WVSCA.  In his appellate brief, Petitioner raised three issues: (1) the circuit court erred in failing to liberally construe Petitioner's state habeas petition; (2) the circuit court erred by declining to appoint counsel to represent Petitioner on his habeas petition; and (3) the circuit court erred in dismissing the petition without making any findings of fact and conclusions of law to support the dismissal. (ECF No. 24-6, Ex. 26 at 64–65).  In his appeal brief, Petitioner also emphasized that his trial counsel failed to obtain medical records supporting his claim of impotency and that trial counsel failed to adequately advise him about a potential plea offer. (*Id.* at 77–79).  Petitioner requested that the WVSCA remand the petition to the circuit court with instructions to appoint counsel and conduct an evidentiary hearing. (*Id.* at 83).

On January 24, 2014, the WVSCA issued a memorandum decision affirming the circuit court's denial of Petitioner's fourth state habeas petition.  (ECF No. 16-1, Ex. 14 at 66-69); *Darrell S. v. Ballard*, No. 13-0564, 2014 WL 274467 (W. Va. Jan. 24, 2014) (memorandum decision). The WVSCA addressed the five issues contained in Petitioner's fourth petition that had not been previously decided: (1) the trial court not allowing impeachment of a "key" State witness; (2) the trial court not renumbering the verdict form; (3) the trial court failing to instruct the jury that evidence of Petitioner's good character alone could provide reasonable doubt; (4) the trial court holding bench conferences off of the record; and (5) Petitioner's sentence violated the *Ex Post Facto* Clause. (ECF No. 16-1, Ex. 14 at 68).  As to the first four issues, the WVSCA determined that they constituted ordinary trial error, and thus, those issues were not cognizable in a habeas

corpus proceeding. (*Id.*) With respect to Petitioner's *Ex Post Facto* Clause claim, the WVSCA concluded that the claim lacked merit. (*Id.*) As to the remaining grounds, the WVSCA acknowledged that the circuit court erred by dismissing the petition based on its similarities to Petitioner's previous state habeas petitions; notwithstanding, the WVSCA observed that the circuit court "always possessed the ability to dismiss the petition as without merit." (*Id.* at 68–69). After "careful consideration," the WVSCA found that the petition was without merit, and consequently, the circuit court had properly dismissed the petition. (*Id.* at 69).

### C. Federal Habeas Petition

On June 20, 2014, Petitioner filed his § 2254 petition seeking a writ of habeas corpus. (ECF No. 1). Therein, Petitioner asserts the following grounds in support of his § 2254 habeas petition:

1. The trial court erred by not allowing critical evidence to impeach a key witness. (ECF No. 1 at 5).

2. The trial court erred by allowing a witness to testify with a teddy bear in hand. (*Id.* at 6).

3. The trial court erred by not renumbering the jury verdict form. (*Id.* at 7).

4. Trial counsel were ineffective when they:

    a.  Failed to impeach a critical witness;

    b.  Failed to investigate or perform certain pretrial functions;

    c.  Failed to properly advise Petitioner as to a plea;

    d.  Failed to use important evidence or testimony at trial;

    e.  Failed to object to the teddy bear being carried into the courtroom;

    f.  Failed to be prepared for trial; and

    g.  Failed to submit a jury instruction regarding Petitioner's character evidence. (*Id.* at 8).

5. The trial judge acted in a biased manner and improperly when she:

      a.   Showed bias toward Petitioner;

      b.   Made prejudicial statements in front of the jury; and

      c.   Refused to allow Petitioner to speak with his lawyer and reprimanded him in front of the jury. (*Id.* at 9).

6.   The trial court erred by failing to instruct the jury that Petitioner's character alone could be the basis for a not guilty verdict. (*Id.* at 10).

7.   Petitioner's right to a public trial was violated when discussions were held off of the record. (*Id.* at 11).

8.   Petitioner's sentence violated the *Ex Post Facto* Clause. (*Id.* at 12).

9.   The trial court erred by not granting a mistrial when B.S. testified about counts in the indictment related to A.L.S., which had been dismissed. (*Id.* at 13).

10. Actual innocence. (*Id.* at 14).

Petitioner also filed a Motion for Equitable Tolling/Extension of Time that same day. (ECF No. 2). On October 10, 2014, Magistrate Judge Eifert ordered Respondent to respond to Petitioner's Motion for Equitable Tolling/Extension of Time, (ECF No. 13).  On November 6, 2014, Respondent submitted his response. In that response, Respondent acknowledged that Petitioner's § 2254 petition is timely and that Petitioner has exhausted his state court remedies for the first eight claims in his petition; however, Respondent argued that Claims 9 and 10 are unexhausted.  (ECF No. 16 at 3–4).  On March 25, 2015, Magistrate Judge Eifert entered an order explaining that she was unable to determine whether Petitioner had exhausted Claim 9 based on the information provided by Respondent and that exhaustion of Claim 10 "was not essential" to proceeding with a review of the § 2254 petition.  (ECF No. 19 at 5–8).  In that order, Magistrate Judge Eifert directed Respondent to answer the petition.  (*Id.* at 8).  On May 26, 2015, Respondent filed an answer, (ECF No. 22), and a motion for summary judgment, (ECF No. 24).[5]  On October

---

[5] Respondent also filed a motion to file exhibits under seal, (ECF No. 23), which Magistrate Judge Eifert granted, (ECF No. 26).

16, 2015, Magistrate Judge Eifert appointed the Office of the Federal Public Defender to represent Petitioner given his age and poor health.  (ECF Nos. 30 & 31).  On January 11, 2016, Petitioner, through counsel, filed a brief in opposition to Respondent's motion for summary judgment, (ECF No. 42), wherein he requested that the Court conduct an evidentiary hearing on the petition, and a Motion to Amend Original Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, (ECF No. 43).  In his motion to amend, Petitioner supplemented his claim of ineffective assistance of counsel. Specifically, Petitioner elaborated on his claims that trial counsel were ineffective when they failed to properly advise Petitioner concerning a potential plea deal and when they failed to investigate Petitioner's claim that he suffered from erectile dysfunction.  (ECF No. 43).  On February 14, 2016, Respondent filed a Response to Petitioner's Motion to Amend. (ECF No. 48). Therein, Respondent conceded that the amended grounds are properly filed and may be properly adjudicated by the Court. (*Id.* at 1). That same day, Respondent also filed a supplemental answer and memorandum of law addressing Petitioner's amended grounds for relief. (ECF Nos. 49 & 50).

## II.    <u>Standard of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (1) and (2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300–01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. "Rather,

that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent has moved for summary judgment. (ECF No. 24).  Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)).  Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail."  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*: Civil § 2725 (3d ed. 2005).  On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c).   In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the

nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson*, 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

## III. <u>Discussion</u>

### A. Petitioner's Motion to Amend His § 2254 Petition

Petitioner has filed a motion to amend his § 2254 Petition. (ECF No. 43). Essentially, Petitioner's motion seeks to elaborate on two claims already presented in his petition. First, Petitioner's motion to amend expands on his claim that he received ineffective assistance of counsel with respect to a plea offer. (*Id.* at 1–2). Second, Petitioner particularizes his claim alleging that trial counsel failed to sufficiently investigate his case prior to trial and contends that trial counsel should have investigated Petitioner's claim that he suffered from erectile dysfunction. (*Id.* at 2–3). Although the AEDPA's one-year limitation period had passed by the time that Petitioner sought to amend his petition, Petitioner asserts that the amendments relate back to the original petition, rendering the amended grounds timely. (ECF No. 44 at 2). Respondent agrees with Petitioner that the amended grounds are exhausted and relate back to the original petition. (ECF No. 48 at 1).

A petition for habeas corpus filed pursuant to § 2254 "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Federal Rule

of Civil Procedure 15(a)(1)(A) provides that a party may amend his or her pleading "once as a matter of course" within "21 days after serving it." "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Federal Rule of Civil Procedure 15(c)(1)(B) explains that an amendment relates back to the date of the "original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

In this case, it seems that Respondent has consented in writing to the amendment of the petition. (ECF No. 48 at 1). In any event, the Court finds that granting leave to amend the petition is appropriate and in the interest of justice. Furthermore, the amended grounds relate back to the original petition since they elaborate on claims raised therein, and therefore, the amended grounds are timely filed. Accordingly, the Court **GRANTS** Petitioner's Motion to Amend Original Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, (ECF No. 43).

### B. Petitioner's Request for an Evidentiary Hearing

In his response to Respondent's Motion for Summary Judgment, Petitioner argues that he is entitled to an evidentiary hearing "because he has alleged facts that would entitle him to relief if true and he diligently sought and was denied the opportunity to develop and prove those facts in the state courts." (ECF No. 42 at 15). Petitioner asserts that he made several attempts to pursue his claims in state court and requested a hearing on his claims, which the state court improperly denied. (*Id.* at 15–16). He insists that § 2254(e)(2) does not bar an evidentiary hearing in this case given his reasonable attempt to pursue his claims in state court. (*Id.*) Furthermore, Petitioner contends that he meets three of the factors for an evidentiary hearing described in *Townsend v. Sain*, 372 U.S. 293 (1963). Specifically, Petitioner asserts that "the fact-finding procedure

26

employed by the state court was not adequate to afford a full and fair hearing; . . . the material facts were not adequately developed at the state-court hearing; [and] . . . it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." (ECF No. 42 at 16) (quoting *Townsend*, 372 U.S. at 313). According to Petitioner, an evidentiary hearing is necessary on his ineffective assistance of counsel claims related to the potential plea agreement and counsel's investigation into his erectile dysfunction. (*Id.* at 17–18, 20).

In contrast, Respondent asserts that Petitioner is not entitled to an evidentiary hearing. First, Respondent contends that Petitioner failed to diligently pursue his claims in state court and that the filing of multiple state habeas petitions alone is insufficient to demonstrate diligence. (ECF No. 50 at 9). Respondent argues that "Petitioner failed to develop material facts in support of his claims [in state court], whereas material facts in support of the denial of his claims were already in existence and spread upon the record." (*Id.* at 10). Assuming that § 2254(e)(2) applies to Petitioner's claims given his lack of diligence, Respondent maintains that Petitioner is "unable to show, by clear and convincing evidence, that the result of the [state court] proceedings would have been different." (*Id.* at 11). Second, Respondent argues that Petitioner does not meet any of the *Townsend* factors. (*Id.*)

The Supreme Court has recognized that the decision to grant an evidentiary hearing on a § 2254 petition is within the discretion of the district court, so long as the petitioner is not barred from obtaining an evidentiary hearing pursuant to § 2254(e)(2). *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). With respect to conducting evidentiary hearings in § 2254 cases, subsection (e)(2) states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." *Id.* at 435. "At a minimum, a diligent petitioner must 'seek an evidentiary hearing in state court in the manner prescribed by state law.'" *Conaway v. Polk*, 453 F.3d 567, 589 (4th Cir. 2006) (quoting *Williams*, 529 U.S. at 437). "If the petitioner was diligent in pursuing the claim in state court, he cannot have 'failed to develop' the claim, and § 2254(e)(2) does not bar an evidentiary hearing." *Wolfe v. Johnson*, 565 F.3d 140, 167 (4th Cir. 2009) (quoting *Williams*, 529 U.S. at 430). The Fourth Circuit has held

[where] § 2254(e)(2) does not proscribe an evidentiary hearing . . . a § 2254 petitioner 'who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, [372 U.S. at 313].'[6]

---

[6] The Supreme Court held in *Townsend* that a federal court must grant an evidentiary hearing to a habeas petitioner if: "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6)

*Wolfe*, 565 F.3d at 168–69 (quoting *Conaway*, 453 F.3d at 582).  However, "'[a]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" *Flippo v. McBride*, No. 5:05-cv-00765, 2009 WL 1543915, at *7 (S.D. W. Va. May 29, 2009) (quoting *Schriro*, 550 U.S. at 474). Furthermore, the Fourth Circuit has recognized that in § 2254 cases, "'federal evidentiary hearings ought to be the exception, not the rule.'" *Winston v. Kelly*, 592 F.3d 535, 552 (4th Cir. 2010) (hereinafter, "*Winston I*") (quoting *Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir. 2007)).

There is another important aspect to the evidentiary hearing inquiry in § 2254 cases.  In *Cullen v. Pinholster*, the Supreme Court held that, when analyzing a state court's rejection of a state prisoner's claim under § 2254(d)(1), a federal habeas court is "limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 181 (2011). Accordingly, any evidence that would be produced at a federal habeas evidentiary hearing on a petitioner's § 2254(d)(1) claims would be meaningless since a federal court cannot consider that evidence in deciding whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.  However, the Fourth Circuit has held that *Pinholster* does not prevent a federal court from conducting an evidentiary hearing on a § 2254 petition, and considering the evidence produced at that hearing, where the state court failed to adjudicate the petitioner's claim on the merits. *Gordon v. Braxton*, 780 F.3d 196, 204 (4th Cir. 2015); *Winston v. Pearson*, 683 F.3d 489, 501–02 (4th Cir. 2012), *cert. denied*, 133 S.Ct. 1458 (2013) (hereinafter, "*Winston II*"). This is so because a prerequisite to the application of § 2254(d) is that the claim was "adjudicated on the merits in state court proceedings." In *Winston II*, the

---

for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." 372 U.S. at 313.

Fourth Circuit recognized that the holding of *Pinholster* does not reach beyond claims analyzed under § 2254(d), and that the *Pinholster* Court did not concern itself with what constitutes an adjudication on the merits for purposes of § 2254(d), other than "terse[ly] acknowledg[ing] that the habeas petitioner's claims [in that case] had been adjudicated on the merits in state-court proceedings." 683 F.3d at 501. Thus, in deciding whether *Pinholster* precludes a federal evidentiary hearing, courts within the Fourth Circuit must consider whether the state court's adjudication of a petitioner's claim was an adjudication on the merits. The Fourth Circuit has indicated that "[a] claim is not adjudicated on the merits when the state court makes its decision on a materially incomplete record. A record may be materially incomplete when a state court unreasonably refuses to permit further development of the facts of a claim." *Gordon*, 780 F.3d at 202.  The Fourth Circuit has found that a state court unreasonably refused to permit further factual development where the state court denied a petitioner's request for an evidentiary hearing on a claim that the Fourth Circuit characterized as a "credibility contest." *Id.* at 203-04.  Similarly, in *Winston I*, the Court held that the state court did not adjudicate the petitioner's claim on the merits where petitioner's request for discovery and an evidentiary hearing were denied by the state court, and the state court "passed on the opportunity to adjudicate [his] claim on a complete record." 592 F.3d at 557. Finally, it bears mentioning that, while a state court's summary denial of a claim may be presumed to be an adjudication on the merits, where the thoroughness of the state court's development of the record underlying the summary denial is challenged by a federal habeas petitioner, a federal court may still find that the state court did not adjudicate the claim on the merits due to the materially incomplete record before the state court.  *See Winston II*, 683 F.3d at 502 (discussing *Harrington v. Richter*, 562 U.S. 86 (2011)).

Turning to the propriety of holding an evidentiary hearing in this case, the Court finds that the state court did not adjudicate on the merits Petitioner's claim related to the advice that he received concerning a plea offer.  Consequently, *Pinholster* does not bar the consideration of new evidence with respect to that claim. The state court's adjudication of the claim was not an on-the-merits adjudication because the state court unreasonably refused to allow further factual development of the issue.  Petitioner twice informed the state circuit court that he was not properly advised by counsel about a plea agreement, and in his fourth state habeas petition, Petitioner supported his claim with a statement of facts. (ECF No. 16-1, Ex. 2 at 7, Ex. 10 at 47, 53). In his second state habeas petition filed with the WVSCA, Petitioner expressed his desire for an evidentiary hearing on his claims, and in his appeal brief concerning his fourth state habeas petition, Petitioner requested that the WVSCA remand the petition with instructions for the circuit court to conduct an evidentiary hearing.  (ECF No. 16-1, Ex. 4 at 19; ECF No. 24-6, Ex. 26 at 83). Notwithstanding Petitioner's clear need for an evidentiary hearing, the state circuit court twice dismissed, without prejudice, Petitioner's ineffective assistance of counsel claims based on Petitioner's failure to provide factual support for his claims.  (ECF No. 16-1, Ex. 3 at 12, Ex. 7 at 34). Yet, when Petitioner alleged sufficient facts to support his ineffective assistance of counsel claims in his fourth state habeas petition, the state circuit court curiously found that the claims had been previously "disposed of" and dismissed the petition with prejudice. (*Id.*, Ex. 11 at 59). The WVSCA subsequently affirmed the circuit court's dismissal without explicitly discussing Petitioner's ineffective assistance of counsel claims.  (*Id.*, Ex. 14 at 68–69). At every step of the state habeas proceedings, the state courts inexplicably denied Petitioner an opportunity to develop his ineffective assistance of counsel claims at an evidentiary hearing. It was particularly important to hold an evidentiary hearing on Petitioner's plea offer claim because that issue inherently requires

a credibility determination, which is typically best made after expansion of the record at an evidentiary hearing. Furthermore, the failure to permit Petitioner to develop his plea offer claim is especially perplexing considering that ineffective assistance of counsel claims are almost exclusively raised in post-conviction proceedings in West Virginia, and the Court is aware that similarly situated prisoners commonly receive evidentiary hearings on analogous claims. Quite simply, the state courts adjudicated Petitioner's plea offer claim on a wholly inadequate record, which the state courts prevented Petitioner from developing. As such, an evidentiary hearing may be appropriate under the Fourth Circuit's decisions in *Winston I*, *Winston II*, and *Gordon*.

Considering the applicability of § 2254(e)(2) to the petition, the Court finds that Petitioner diligently pursued his plea offer claim in state court when he raised the issue multiple times in state habeas proceedings and requested an evidentiary hearing on the claim. *See Conaway*, 453 F.3d at 589. In other words, by submitting multiple state habeas petitions along with a statement of supporting facts, and twice requesting an evidentiary hearing, Petitioner "made a reasonable attempt . . . to investigate and pursue [his] claims in state court." *Williams*, 529 U.S. at 435. In light of Petitioner's circumstances and the state court's refusal to hold an evidentiary hearing, he did all that he could to pursue his claim. Accordingly, § 2254(e)(2) does not bar Petitioner from obtaining an evidentiary hearing in this Court.

Finally, the Court must determine whether the facts alleged by Petitioner would entitle him to relief, and whether he satisfies one of the six factors enumerated by the Supreme Court in *Townsend*. *Wolfe*, 565 F.3d at 168–69. Beginning with the latter inquiry, the Court finds that Petitioner meets at least one of the *Townsend* factors. Specifically, the state court "did not afford [Petitioner] a full and fair fact hearing" on his plea hearing claim. *Townsend*, 372 U.S. at 313.

Indeed, the state court did not hold any "fact hearing" at all on Petitioner's state habeas claims. Thus, Petitioner satisfies the *Townsend* test for an evidentiary hearing.

Furthermore, Petitioner's allegations, if true, would entitle him to relief.  In *Missouri v. Frye*, the Supreme Court held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." ___ U.S. ___, 132 S.Ct. 1399, 1408 (2012). Applying that holding to the facts presented in *Frye*, the Supreme Court concluded that the defendant's counsel provided deficient performance at the plea bargaining stage when counsel allowed a plea offer "to expire without advising the defendant or allowing him to consider it." *Id.*  The Court recognized that "codified standards of professional practice … can be important guides" in assessing counsel's performance during the plea bargaining process. *Id.*  One of the "codified standards" specifically discussed by the Court requires counsel to "promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney . . . ." *Id.* (quoting ABA Standards for Criminal Justice, Pleas of Guilty 14–3.2(a) (3d ed. 1999)). Turning to the prejudice analysis in the plea bargaining context, the Court held that "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Id.* at 1409.  In addition, the Court stated that defendants "must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law." *Id.*  The Court also noted the importance of considering whether "the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time" in the prejudice analysis.  *Id.*

On the same day that the Court decided *Frye*, the Court also issued its opinion in *Lafler v. Cooper*, ___ U.S. ___, 132 S.Ct. 1376 (2012). In *Lafler*, the defendant's counsel communicated a plea offer to the defendant, but provided erroneous advice to the defendant by informing the defendant that he could not be convicted at trial, resulting in the defendant rejecting the plea offer. 132 S.Ct. at 1383–84. The defendant was then convicted at trial and received a sentence much harsher than that which would have likely resulted from acceptance of the plea offer. *Id.* at 1386. In assessing whether a trial "free from constitutional flaw" prevented the defendant from claiming prejudice, the Court reasoned that "the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Id.* Ultimately, the Court rejected the notion that "[a] fair trial wipes clean any deficient performance by defense counsel during plea bargaining." *Id.* at 1388.

Here, Petitioner alleges in his § 2254 petition that trial counsel failed to properly advise him about a plea bargain offered by the state. (ECF No. 1 at 8). In his fourth state habeas petition, Petitioner elaborated on this claim and explained that trial counsel called him while at work to discuss a plea offer, but Petitioner could not discuss the issue at that time. (ECF No. 16-1, Ex. 10 at 53). According to Petitioner, defense counsel demanded an answer to the plea offer within an hour of the telephone call and without "appropriately" advising Petitioner about the details of the offer. (*Id.*) Petitioner alleges that he declined the plea offer as a result of counsel's insistence on an answer and that counsel failed to fully inform him about its details before his hurried response. (*Id.*) Moreover, Petitioner maintains that "it is very likely" he would accepted the plea offer if counsel would have explained the consequences of going to trial versus accepting the offer. (ECF No. 24-6 at 79). Applying *Frye* and *Lafler* to Petitioner's claim, the Court finds that Petitioner's allegations, if true, would entitle him to relief. If counsel failed to adequately communicate and

explain the plea offer to Petitioner and allowed Petitioner to reject the offer without a sufficient understanding of the offer and the consequences of its rejection, then counsel's performance would be deficient.   As to prejudice, the offer would have allowed Petitioner to plead guilty to three counts of first-degree sexual abuse, (ECF No. 42-1 at 2), which would have exposed Petitioner to a lower sentence than that which he ultimately received. *Compare* W. Va. Code § 61-8B-7(b) (2005) (providing one to five year sentence for first-degree sexual abuse conviction), *with* W. Va. Code § 61-8D-5(a) (2005) (providing ten to twenty year sentence for sexual abuse by custodian conviction).[7] Petitioner was also convicted of four additional offenses that he would not have been if he had accepted the plea offer. The lower potential sentence and fewer number of convictions that would have resulted from accepting the plea offer tend to support Petitioner's claim that he "very likely" would have agreed to the offer if fully explained to him by counsel. Moreover, there is no reason to believe on the record that is currently before the Court that the prosecution would have canceled the offer or that the trial court would have rejected the plea agreement. Accordingly, Petitioner may well be able to meet the prejudice standard for his plea offer claim. In sum, Petitioner is entitled to an evidentiary hearing on his plea offer claim because the facts alleged by Petitioner would entitle him to relief, and he satisfies at least one of the six factors described by the Supreme Court in *Townsend*.

In light of the Court's finding that Petitioner is entitled to an evidentiary hearing on his plea offer claim, the Court **DENIES** Respondent's Motion for Summary Judgment as to that claim and **RE-REFERS** this case to Magistrate Judge Eifert to conduct the hearing.  After the evidentiary hearing has been held, Magistrate Judge Eifert shall submit proposed findings of fact and

---

[7] In 2006, West Virginia Code § 61-8B-7 was amended to add a subsection (c), which provides that a person over eighteen years of age who commits first-degree sexual abuse against a victim younger than twelve shall be imprisoned for not less than five nor more than twenty-five years.

recommendations on the merits of Petitioner's claim.  The Court also finds that the state court record is sufficient for this Court to address the merits of the remainder of Petitioner's § 2254 claims; as such, Petitioner is not entitled to an evidentiary hearing on any of his other grounds for relief.  *See Flippo*, 2009 WL 1543915, at *7.

To the extent that Petitioner argues that he is entitled to an evidentiary hearing on his failure to investigate claim related to his alleged impotency, the Court is unpersuaded. Petitioner has never attempted to obtain his own medical records to support his failure to investigate claim, and as such, he has not diligently pursued that claim. Indeed, there is no indication in Petitioner's instant § 2254 or response memorandum that he has sought medical records to support his claim.  Although Petitioner did not submit additional evidence supporting his plea offer claim in state court, that claim differs from his failure to investigate claim in that there was little chance for Petitioner to develop his plea offer claim without the testimony of his trial counsel at an evidentiary hearing. At the very least, on his failure to investigate claim, Petitioner could have sought his medical records and submitted them to the state court or this Court.  Given Petitioner's lack of diligence, § 2254(e)(2) bars an evidentiary hearing on his failure to investigate claim because the claim does not rely on a new retroactive rule of constitutional law that was previously unavailable to him or "a factual predicate that could not have been previously discovered through the exercise of due diligence." Furthermore, even if § 2254(e)(2) were inapplicable to Petitioner's request for a hearing on this claim because he made a "reasonable attempt" to develop it in state court, he still would not be entitled to an evidentiary hearing since, as discussed below, the facts alleged would not entitle him to relief.  *See Wolfe*, 565 F.3d at 168–69 (citing *Conway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006)). With that, the Court addresses the merits of Petitioner's other claims.

### C. Petitioner's Remaining Grounds for Relief

#### 1. Impeachment Evidence

In his first ground for relief, Petitioner argues that the trial court "erred by not allowing critical evidence to impeach [a] key witness." (ECF No. 1 at 5). Petitioner claims that there was "rebuttal testimony to show that A.S. lied, however, the [trial court] would not allow it into testimony [*sic*]. The [trial court] ruled it was not relevant. By doing so, the [trial court] placed the burden of proof on the defense." (*Id.*) Petitioner does not describe the rebuttal testimony that he hoped would be admitted. However, a review of the statement of facts attached to Petitioner's fourth state habeas petition reveals that Petitioner refers to the trial court's refusal to admit church ledgers into evidence during Reverend Thaxton's testimony. (ECF No. 16-1, Ex. 10 at 52). The WVSCA addressed the claim in its January 24, 2014 memorandum decision and determined that the claim was not cognizable in a state habeas proceeding. (*Id.* at 68).

A state court's application of state evidentiary rules is typically not within the province of federal habeas review. *See Burger v. Woods*, 515 F. App'x 507, 509 (6th Cir. 2013) ("Federal habeas courts do not review state-court rulings on state-law questions.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Welsh v. Cartledge*, No. 4:13-296-MGL, 2014 WL 272108, at *6 (D.S.C. Jan. 24, 2014) (adopting report and recommendation wherein magistrate judge concluded that petitioner's challenge to state court's admission of 404(b) evidence was not cognizable in federal habeas); *Lucas v. McBride*, 505 F. Supp. 2d 329, 354 (N.D. W. Va. 2007) (holding petitioner's challenge to state court's admission of 404(b) evidence was not cognizable on federal habeas review). Nevertheless, a state court evidentiary ruling, in rare circumstances, may cross the federal due-process line. As the Fourth Circuit has recognized, "[i]n federal habeas actions, [federal courts] do not sit to review the admissibility of evidence under state law unless erroneous

evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (quoting *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993)) (markings omitted).

Particularly pertinent here, a defendant's "right to due process guarantees 'the right to a fair opportunity to defend against the State's accusations . . . .'" *United States v. Jinwright*, 683 F.3d 471, 482–83 (4th Cir. 2012) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294–95 (1973)). However, a defendant's right to present a defense is not unlimited. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) (recognizing defendant's right to present relevant evidence is subject to reasonable restrictions). "A defendant's interest in presenting . . . evidence may . . . bow to accommodate other legitimate interests in the criminal trial process." *Id.* (citations and markings omitted). The exclusion of evidence as a result of accommodating these other legitimate interests is only unconstitutional where the exclusion "has infringed upon a weighty interest of the accused" or "significantly undermined the fundamental elements of the defendant's defense." *Id.* at 308, 315; *see also Fry v. Pliler*, 551 U.S. 112, 124 (2007) (Stevens, J., concurring in part and dissenting in part) ("[D]ue process considerations hold sway over state evidentiary rules only when the exclusion of evidence undermines fundamental elements of the defendant's defense.") (citation and markings omitted).

The WVSCA rejected Petitioner's impeachment evidence claim on a procedural ground by determining that the claim was not cognizable in a state habeas proceeding. The principle of procedural default prevents a federal court from granting habeas relief on a claim that was denied on a state procedural ground. The procedural default doctrine provides that "[f]ederal courts may

not hear a section 2254 claim if a state court disposed of the claim on adequate and independent state-law grounds, unless the petitioner can show cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). Nevertheless, a federal court may dispose of a potentially defaulted claim on the merits. *See Flippo v. McBride*, 393 F. App'x 93, 97 (4th Cir. 2010) ("Although courts may reach the merits of a habeas petition to deny it, 28 U.S.C. § 2254(b)(2), they cannot issue the writ for unexhausted or procedurally defaulted claims."); *Eaton v. Angelone*, 139 F.3d 990, 994 n.1 (4th Cir. 1998) ("Because we agree with the district court's denial of [petitioner's] ineffectiveness claims on the merits, we need not resolve the thorny issue of procedural default."). The Court chooses to do so in this instance.

Petitioner claims that the trial court erred when it refused to admit church ledgers showing payments to A.S. and her family. Petitioner believes that this evidence would have substantially undermined A.S's credibility since A.S. testified that members of the church were hostile toward her children after the abuse allegations became known within the congregation. However, as the trial court correctly pointed out, the particular ledgers offered into evidence were not relevant because they pre-dated the allegations of sexual abuse. (ECF No. 24-3 at 59). Indeed, the prosecuting attorney stated on the record that the ledgers showed payments in 2003 and 2004, and Petitioner's counsel did not disagree with that characterization of the evidence. (*Id.* at 58). Accordingly, they had no bearing on A.S.'s testimony about how the church treated her family after the allegations were made public in 2005. For that reason, the Court cannot conclude that the trial court's exclusion of the church ledgers "infringed upon a weighty interest of [Petitioner]" or "significantly undermined the fundamental elements of [Petitioner's] defense." *Scheffer*, 523 U.S. at 308, 315. Likewise, the Court finds that the trial court's evidentiary ruling was not "so extreme

as to result in a denial of a constitutionally fair proceeding." *Burket*, 208 F.3d at 186. Accordingly, the Court **DENIES** Petitioner's first ground for relief and **GRANTS** Respondent's motion for summary judgment on ground one of Petitioner's § 2254 petition.

### 2. B.S.'s Holding of a Teddy Bear While Testifying

In his second ground for relief, Petitioner alleges that the trial court "erred by allowing [a] witness to testify with a 'teddy bear' in hand." (ECF No. 1 at 6). Petitioner explains that the trial court "allowed a teenager to hold a teddy bear while on the witness stand and then the witness threw it down on the way out of the courtroom. It was clearly used as theatrics." (*Id.*) Although Petitioner does not identify which victim held the teddy bear during trial, in his fourth state habeas petition Petitioner indicated that B.S. held the toy while testifying.  (ECF No. 16-1, Ex. 10 at 51). Petitioner first raised the issue in his initial state habeas petition, and the circuit court denied the claim as not cognizable in state habeas.  (ECF No. 16-1, Ex. 2 at 7, 13).  Petitioner next raised this claim in his original jurisdiction habeas petition filed with the WVSCA, which the WVSCA summarily refused. (*Id.*, Ex. 4 at 19–20, 23). Petitioner again argued the claim in his third state habeas petition, and the circuit court reiterated that the claim was not cognizable. (*Id.* at 28, 35). Finally, Petitioner raised the claim in his fourth state habeas petition, and the circuit court dismissed the claim as having been previously decided. (*Id.*, Ex. 10 at 51–52, 59). On appeal, the WVSCA affirmed the dismissal of the claim without explicitly discussing it, but the appellate court did state that the circuit court should not have dismissed Petitioner's fourth state habeas petition "solely because of its similarities to" the first two petitions that Petitioner filed in the state circuit court. (*Id.*, Ex. 14 at 69). Still, the WVSCA went on to find that Petitioner's fourth state habeas petition was meritless. (*Id.*)  Because the WVSCA denied Petitioner's fourth habeas petition "as meritless" and did not explicitly address Petitioner's teddy bear argument, the Court accepts that

the WVSCA adjudicated the claim on the merits.[8]  *See Johnson v. Williams*, ___ U.S. ___, 133 S.

Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing

that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits

. . . ."); *Richter*, 562 U.S. at 98–99 (holding summary denial of a claim by state appellate court

may be presumed to be an adjudication on the merits). Accordingly, the Court will apply AEDPA

deference to the WVSCA's denial of the claim.

A number of federal and state courts have considered the use of a "comfort item" by a

young witness during his or her testimony on sensitive or difficult subject matter. *See generally*

Fern L. Kletter, *Propriety of Allowing Witness to Hold Stuffed Animal, Doll, Toy or Other Comfort

Item During Testimony*, 82 A.L.R.6th 373 (2013). At least one federal court summarily denied a

similar claim by a federal habeas petitioner where a seventeen-year-old victim of sexual abuse was

allowed to hold a stuffed toy bear during her testimony. *See Romero v. Hill*, No. CV 07-917-PK,

2009 WL 4110201, at *1, *3–4 (D. Or. Nov. 23, 2009). Similarly, in *Day v. McCullough*, the court

rejected the petitioner's argument that he was denied a fair trial when the child sexual abuse victim

was permitted to hold a "Koosh ball" during his testimony. No. C10-5264 BHS/KLS, 2010 WL

5838992, at *4–7 (W.D. Wash. Dec. 6, 2010), *report and recommendation adopted by* No. C10-

5264BHS, 2011 WL 677439 (W.D. Wash. Feb. 15, 2011).  The court noted that the child witness's

holding of the ball while testifying was "neither spectator conduct nor state sponsored conduct,"

and that the petitioner was not denied his right to confront and cross-examine the child witness.

---

[8] When a state court's denial of a claim is unaccompanied by an explanation for that denial, "a federal habeas court is to 'look through' the unexplained affirmance to examine the 'last reasoned decision' on the claim, assuming that the summary appellate decision rests on the same ground." *Grueninger v. Va. Dep't of Corr.*, 813 F.3d 517, 525–26 (4th Cir. 2016) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 806 (1991)). Here, however, the WVSCA denounced the lower court's procedural ruling and independently found that Petitioner's fourth state habeas petition was meritless. As such, the Court does not apply the "look through" doctrine.

*Day*, 2010 WL 5838992, at *7. The court also reasoned that there was no evidence that the witness's holding of the ball influenced the jury's determination of the witness's credibility. *Id.* In addition, state courts have also found similar claims unpersuasive. *See State v. Powell*, 318 S.W.3d 297, 302–04 (Mo. Ct. App. 2010) (holding that trial court did not abuse discretion in allowing sixteen-year-old and eleven-year-old victims of sexual abuse to hold teddy bear while testifying); *State v. Presley*, No. 02AP-1354, 2003 WL 22681425, at *10–11 (Ohio Ct. App. Nov. 13, 2003) (rejecting violation of right to fair trial claim based on thirteen-year-old sexual abuse victim's holding of teddy bear on cross-examination).

In this case, the Court finds Petitioner's claim unconvincing because he has failed to identify any clearly established federal law that conflicts with the WVSCA's decision and that prohibited the trial court from allowing B.S. to hold a teddy bear while testifying. Furthermore, the Court cannot conclude that Petitioner was denied a fair trial on this basis. No mention or actual use of the teddy bear is apparent from the record, and Petitioner has not presented any evidence that B.S.'s possession of the teddy bear swayed the jury's credibility determination. Insofar as Petitioner may assert that a single juror cried throughout B.S.'s testimony, (ECF No. 16-1, Ex. 10 at 52), it is likely that the juror may have been overcome with emotion not based on the appearance of a stuffed animal, but as a result of hearing B.S. describe her struggle with lymphoma and the abuse that she suffered at Petitioner's hands after enduring such a hardship. Separately, the Court observes that if Petitioner is correct that B.S.'s use of the teddy bear was obviously theatrical given her careless discard of the item at the conclusion of her testimony, one may infer that the jury would have also witnessed B.S.'s actions and assessed her credibility accordingly. Finally, as discussed below, Petitioner's counsel were able to use B.S.'s holding of the stuffed animal as part of their trial strategy in closing argument by insisting that B.S.'s testimony was "staged." (ECF

No. 24-4, Ex. 19 at 58–59). For these reasons, the Court **DENIES** Petitioner's second ground for relief and **GRANTS** Respondent's motion for summary judgment on ground two of Petitioner's § 2254 petition.

### 3. Numbering of the Jury Verdict Form

Next, Petitioner argues that the trial court erred by failing to renumber the jury verdict form. (ECF No. 1 at 7). Petitioner asserts that the trial court should have renumbered the verdict form after certain counts were dismissed prior to trial. (*Id.*) Petitioner first raised this claim in his fourth state habeas petition. (ECF No. 16-1, Ex. 10 at 47). On appeal, the WVSCA found that the claim was not cognizable in a state habeas corpus proceeding. (*Id.*, Ex. 14 at 68). As with Petitioner's first ground for relief, it appears that Petitioner would be barred under the procedural default doctrine from raising this contention given the WVSCA's procedural dismissal of the claim. However, the Court need not wade into the procedural issues surrounding this claim because Petitioner's argument lacks merit.

A claim is cognizable in a § 2254 habeas corpus proceeding only if it arises from a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has not cited any support for his claim, legal or factual. However, the Court notes that To the extent that Petitioner might argue that he was prejudiced because the jury might have believed that he was charged with additional criminal conduct, his argument would rely entirely on speculation. *See Lister v. Jones*, No. CIV-07-732-M, 2009 WL 2163514, at *6 (W.D. Okla. July 10, 2009) (rejecting identical claim where petitioner "offer[ed] nothing more than speculation" to support his argument), *aff'd*, 357 F. App'x 176 (10th Cir. 2009). Indeed, it is just as likely that the numbering of the verdict form favored Petitioner because the jury may have concluded that the State had not previously been able to procure sufficient evidence on the

dismissed counts, which could have caused the jury to be more critical of the State's case. Moreover, defense counsel agreed that a jury instruction would resolve the issue, (ECF No. 24-3, Ex. 18 at 223), and the trial court provided an instruction clearly commanding the jury to disregard the numbering of the verdict form. (ECF No. 24-4, Ex. 19 at 16). The jury is presumed to have followed the trial court's instruction on the issue. *Jones v. United States*, 527 U.S. 373, 394 (1999). For the aforementioned reasons, the Court **FINDS** that Petitioner's dissatisfaction with the numbering on the verdict form does not give rise to a constitutional violation. 28 U.S.C. § 2254(a). It therefore **DENIES** Petitioner's third ground for relief and **GRANTS** Respondent's motion for summary judgment on ground three of Petitioner's § 2254 petition.

### 4. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate . . . defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v.*

*Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable."  *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge where the state court adjudicated the petitioner's ineffective assistance of counsel claims on the merits.  *Richter*, 562 U.S. at 105. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 788 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' . . . Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  When a state court has adjudicated an ineffective assistance of counsel claim on the merits in summary fashion, the issue is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

In his fourth assignment of error, Petitioner alleges that his Sixth Amendment right to the effective assistance of counsel was violated by his trial attorneys in the following seven ways:

    a.       Counsel failed to impeach critical witnesses;

    b.       Counsel failed to investigate or perform certain pretrial functions;

    c.       Counsel did not properly advise defendant as to a plea;

    d.       Counsel failed to use important evidence or testimony at trial;

    e.       Counsel did not object to a teddy bear being carried into the courtroom;

    f.       Counsel was unprepared for the jury trial; and

    g.       Counsel failed to submit jury instructions to show the character of the defendant.

(ECF No. 1 at 4).  Although Petitioner does not elaborate in this proceeding on any of the alleged errors, except his plea offer and failure to investigate claims, records supplied from the state court

proceedings elucidate their factual underpinnings. Petitioner's criticisms of his counsel's professional services can be divided into three categories: (1) pre-trial preparation; (2) trial strategy; and (3) communication regarding plea agreement.[9]  Before examining each category of counsel's representation, the Court notes that Petitioner raised various ineffective assistance of counsel claims throughout his state habeas proceedings. All of the claims above were raised in Petitioner's fourth state habeas petition.  In essence, the WVSCA's January 24, 2014 memorandum decision summarily denied Petitioner's ineffective assistance of counsel claims contained in his fourth state habeas petition on the merits. (ECF No. 16-1, Ex. 14 at 69). Accordingly, the Court applies AEDPA deference to the ineffective assistance of counsel claims raised by Petitioner in this case, other than Petitioner's claim concerning plea offer advice.[10] Notwithstanding, the Court finds that, even if AEDPA deference were not applicable, Petitioner's claims of ineffective assistance of counsel would not entitle him to relief.

   *a. Pre-trial Investigation (Sub-ground (b) of Ground 4)*

   Under *Strickland*, defense counsel's duty to investigate requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690–91. Defense counsel's "investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for Criminal Justice, 4-4.1 (2d ed. 1982 Supp.)). Likewise, "as with any record of an accused's statements made in police

---

[9] Categorizing Petitioner's ineffective assistance of counsel claims in this way, category (1) consists of sub-ground (b); category (2) consists of sub-grounds (a), (d), (e), (f), and (g); and category (3) includes sub-ground (c).

[10] As mentioned above, there is no lower court decision to examine under the "look through" doctrine since the circuit court summarily dismissed the ineffective assistance of counsel claims contained in Petitioner's fourth state habeas petition. (ECF No. 16-1, Ex. 11 at 59–60).

custody, and especially a statement volunteered without the benefit of a lawyer's advice, the notes should [be] parsed to ascertain not only the havoc the accused might have wreaked upon his defense, but also any boon he may have unwittingly bestowed." *Tice v. Johnson*, 647 F.3d 87, 104 (4th Cir. 2011); *see also Rompilla*, 545 U.S. at 387 (endorsing the ABA's recommendation that "[t]he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty").[11] However, "a court's review of counsel's decision not to investigate is highly deferential in light of the circumstances at the time of counsel's representation." *Strickland*, 466 U.S. at 691. As the Supreme Court has explained,

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* Moreover, even where counsel could have made a more thorough investigation, the proper inquiry into claims of ineffective assistance is "not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp,* 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic,* 466 U.S. 648, 665 n.38 (1984)). Thus, in order to be successful on this type of claim, a

---

[11] The current version of the ABA Standards, which omits the term "always," now states that "investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities." *ABA Standards for Criminal Justice: Prosecution and Defense Function* (3d ed. 1993). The Supreme Court has indicated that it sees "no material difference between these two phrasings, and in any case cannot think of any situation in which defense counsel should not make some effort to learn the information in the possession of the prosecution and law enforcement authorities." *Rompilla*, 545 U.S. at 387 n.6.

petitioner must explain what useful evidence would have been obtained from the additional interviews or meetings. *See Bassette v. Thompson,* 915 F.2d 932, 940–41 (4th Cir. 1990) (rejecting petitioner's "general claim that additional witnesses should have been called in mitigation").

Petitioner asserts that "a more concise investigation of the statements made to the police and the DHHR should have been done." (ECF No. 16-1, Ex. 10 at 53). In addition, he claims that his attorney should have investigated the testimony of the school counselor to "see how B.S. approached her and started the conversation." (*Id.*) Petitioner does not explain what useful evidence might have been gained by conducting this supplemental investigation.

A review of the trial transcript reveals that defense counsel devoted considerable effort both before and during trial to undermining the reliability of the victims' statements. Not only did counsel obtain the statements, review and analyze them, (*see* ECF No. 24-2, Ex. 17 at 205–07, 224–26, 231–32), but counsel also retained a highly qualified expert to testify regarding the improper techniques used by the DHHR case worker and the investigating officers during their interviews of the victims.  (ECF No. 24-3, Ex. 18 at 110–48.)  Furthermore, counsel requested a pretrial taint hearing in an effort to have the statements ruled inadmissible at trial. Clearly, counsel's investigation of the formal statements fell well within the range of constitutionally competent representation.

Although the record is not clear as to the extent of counsel's investigation of the school counselor's discussion with B.S., Petitioner can show no prejudice from a lack of investigation. The school counselor had one conversation with B.S. and then called her mother. B.S. and her mother testified briefly about this encounter. Thereafter, B.S. spoke with the case worker and police officer, and her statements to these individuals formed the basis of the charges against Petitioner. The school counselor was not called as a witness at trial and played no role in the

outcome of the case. Therefore, Petitioner's challenge on this ground must fail.

In support of his ineffective assistance of counsel claim, Petitioner also argued in his state habeas proceeding that his counsel failed to obtain "medical records of witnesses to disprove witnesses allegations" and for failing to request "psychological testing" of the minor victims. (ECF No. 16-1 at 53). Furthermore, Petitioner asserted that counsel should have "investigated or called a J.L. as a witness to corroborate or deny testimony of B.S. even if by video conference." (*Id.*) Once again, Petitioner offers no explanation of what useful evidence any of these activities would have returned. The subject of J.L.'s testimony is pure speculation; there is no telling whether her testimony would have weighed in favor of exoneration or conviction. Furthermore, Petitioner produces no evidence to substantiate that medical records even existed which were relevant to the victims' allegations. The victims did not accuse Petitioner of having sexual intercourse with them, nor did they claim to have sought medical or psychological treatment as a result of his abuse. The prosecution did not offer any treatment records into evidence, and there was no testimony concerning medical care. Accordingly, Petitioner's assertion that medical records should have been collected is based entirely upon an unsubstantiated belief that such records exist.

Similarly, to have obtained an order compelling the victims to undergo psychological testing, Petitioner's counsel would have been required by West Virginia law to demonstrate a compelling need or reason for the examinations. *State v. Delaney*, 417 S.E.2d 903, 907 (W.Va. 1992). Simply being the victim of a crime is not, by itself, sufficient to warrant compulsory testing. *See id.* at 906–07 (noting that pretrial discovery in criminal cases is "generally within the discretion of the trial court"; requiring trial judge to consider six factors in evaluating evidence of compelling need). Therefore, Petitioner offers no justification for counsel to have filed such a motion. There

is simply no basis to find that counsel's representation in this regard—either by failing to gather the victim's medical records (assuming relevant records existed), to request psychological evaluations, or to call J.L. as a witness—"fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Finally, Petitioner insists in opposition to Respondent's summary judgment motion that his trial counsel "could have, but failed to, investigate and find records substantiating his claim that he suffered from erectile dysfunction which made it impossible for him to ejaculate as N.S. had claimed." (ECF No. 42 at 19). However, Petitioner has offered no evidence that he informed his counsel before trial that he suffered from erectile dysfunction. One would assume that Petitioner would have immediately volunteered that information to his counsel for investigation when preparing for trial; however, the record is devoid of such evidence. Furthermore, Petitioner never submitted any proof to the state court or this Court establishing that medical records existed confirming his erectile dysfunction prior to trial. Accordingly, Petitioner cannot meet the deficient performance prong of the *Strickland* test. Without any indication of the information his medical records might have revealed, Petitioner likewise cannot show that their absence was prejudicial under *Strickland's* second prong. *Strickland*, 466 U.S. at 694. For these reasons, the Court **FINDS** that the WVSCA's decision that counsel's pretrial preparation was not constitutionally deficient was not an objectively unreasonable interpretation of federal law.

*b. Trial Strategy and Presentation (Sub-grounds (a), (d), (e), (f), and (g))*

Petitioner contends that his trial counsel was ineffective in her cross-examination of the minor victims, failing to highlight inconsistencies in their testimony. (*See* ECF No. 16-1, Ex. 10 at 52). As an example, Petitioner points to N.S.'s testimony that she was five or six years old when Petitioner began to abuse her at his home in Dunbar. (*Id.*) Petitioner asserts that he did not move

to Dunbar until 1998, when N.S. was eight years old. In addition, Petitioner disputes B.S.'s testimony that Petitioner only visited her a couple of times when she was hospitalized for cancer treatment. Petitioner claims that his counsel should have established that he went to the hospital every day of B.S.'s stay to make sure that she was treated properly and well. (*Id.*)

Unfortunately for trial lawyers, the examination of any witness is fraught with peril, because the lawyer has limited control over what the individual will say while on the witness stand. For that reason, "[d]efense counsel's determinations concerning witness examination fall within the ambit of trial strategy that federal habeas courts are not inclined to second-guess." *Williams v. Bishop*, No. CCB-13-3755, 2015 WL 4984396, at *8 (D. Md. Aug. 18, 2015) (citing *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004)).  Obviously, Petitioner is hard-pressed to demonstrate either *Strickland* prong with this claim.  Even if counsel could have established that the victims had poor memories about certain aspects of their past, the topics were tangential and unrelated to Petitioner's guilt or innocence. Quibbling with B.S. over the number of times Petitioner visited her in the hospital would likely have accomplished nothing and may have appeared mean-spirited or petty, provoking sympathy for B.S. With respect to N.S., Petitioner's suggestion that counsel should have impeached N.S. about the location of Petitioner's residence when the sexual abuse began is absurd.  Although the prosecution had charged Petitioner with three counts of sexually abusing N.S. when she was eleven years old or younger, the prosecutor had been unable to elicit testimony from N.S. on direct examination to support those charges. Consequently, asking N.S. any questions that might solicit testimony tending to establish the unproven sexual abuse charges was a risk no defense attorney would find worth taking. In any event, during his testimony, Petitioner told the jury that N.S. claimed he had started molesting her in Dunbar when she was five or six years old even though he did not move to Dunbar until N.S. was eight years old. (ECF

No. 24-3, Ex. 18 at 88). Therefore, Petitioner received the benefit of the inconsistency without taking any of the risk.

Petitioner also claims that counsel was not prepared for trial. As evidence, Petitioner points to counsel's failure to object when B.S. brought a teddy bear with her to the witness stand, as well as counsel's failure to call Mr. Wagner as a rebuttal witness to impeach N.S.'s testimony about incidents that allegedly occurred at Mr. Wagner's office.[12]  However, neither of these decisions rises to the level of ineffective assistance of counsel. An attorney's trial strategy—such as what motions to make, which witnesses to call, and if and how to cross examine witnesses—is entitled to great deference on review. As the Supreme Court explained in *Strickland*:

> It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 688–89. The major themes of the defense were that the victims lived in a sexually explicit home environment and their accusations were fictitious, were coached by their mother, were gradually embellished, and were ultimately staged for trial. In closing argument,

---

[12] N.S. reported in a statement to the Dunbar Police Department that her grandfather asked her for sex during a visit to the office of his former attorney, Walt Wagner.  (ECF No. 24-2, Ex. 17 at 227–28.)  She was briefly asked about this statement on cross-examination, but did not elaborate.  Though defense counsel did not bring up the incident during Mr. Wagner's testimony, Petitioner later took the witness stand and contradicted N.S.'s testimony by denying that he ever brought N.S. to Mr. Wagner's office, much less propositioned her for sex at that location.  (ECF No. 24-3, Ex. 18 at 85.)  Counsel could reasonably have determined that further fixation on this uncharged conduct was not worth the risk of cementing the jury's unfavorable view of Petitioner.

Petitioner's counsel referred to B.S's use of the teddy bear as proof of fabrication and staging, noting that at fourteen years of age, B.S. was far too mature to carry a child's toy. Thus, when taking into account the defense's themes, counsel's decision not to object to B.S. having a teddy bear at the witness stand was a reasonable trial strategy. Further, counsel could have reasonably been concerned that such an objection would appear mean-spirited or harsh to the jury. Similarly, counsel's decision not to question N.S. and Mr. Wagner in greater detail about an allegation of inappropriate touching that was not a part of the underlying charges certainly fell within the broad range of reasonable trial strategy.

Next, Petitioner argues that counsel was ineffective for failing to offer an instruction advising the jury that evidence of Petitioner's good character, standing alone, could give rise to reasonable doubt regarding his guilt. (ECF No. 16-1, Ex. 10 at 54). Counsel introduced two witnesses, both local attorneys and long-time friends of Petitioner, who testified that Petitioner was truthful and would never lie under oath. Despite submitting this character evidence, counsel failed to tender an instruction educating the jury on how it should consider the evidence.

West Virginia law entitles a criminal defendant to an instruction advising the jury that it may consider evidence of good character when assessing reasonable doubt. *State v. Surbaugh,* 737 S.E.2d 240, 257 (W. Va. 2012). However, contrary to Petitioner's assertion, "[a]n instruction which states or suggests that good character, standing alone, may generate reasonable doubt is erroneous." *Id.* In this case, the jurors did not receive an instruction on how to consider Petitioner's good character evidence. Nonetheless, they were thoroughly instructed on what factors they should consider in evaluating the credibility of the witnesses and in weighing the evidence. (ECF No. 24-4, Ex. 19 at 19–22). They were also instructed by the trial court that Petitioner was a competent witness on his own behalf, who was presumed innocent, and they had "no right to disregard or

disbelieve his evidence in whole or in part merely because he [was] on trial with a crime." (*Id.* at 22–23). The jury was permitted to hear the testimony of Petitioner's character witnesses without objection. Thus, the Court concludes that there is not a reasonable probability that, but for counsel's failure to request to an instruction related to Petitioner's good character, the result of the proceeding would have been different. Accordingly, even assuming that counsel was ineffective under the first prong of *Strickland* for failing to offer the good character instruction, Petitioner is unable to establish prejudice under the second prong of *Strickland*.[13]   For these reasons, the WVSCA's application of *Strickland* was not unreasonable.

### c. Communication Regarding Plea Offer (Subground (c))

As explained at length above, Petitioner also claims that defense counsel was ineffective when they failed to adequately convey a plea offer to him. Given the Court's conclusion that an evidentiary hearing is necessary on this claim, the Court defers ruling on its merits until Magistrate Judge Eifert conducts the hearing and submits proposed findings and recommendations on the claim.

### d. Ineffective Assistance of Counsel Conclusion

For the aforementioned reasons, and with the exception of Ground Four, subsection (c) of the § 2254 Petition, the Court **FINDS** that in rejecting Petitioner's ineffective assistance of counsel claims, the WVSCA did not render a decision that was "contrary to," or "an unreasonable application of," *Strickland*. 28 U.S.C. § 2254(d)(1). Accordingly, the Court **GRANTS** Respondent's motion for summary judgment on Ground Four, subsections (a), (b), (d), (e), (f), and (g). As to subsection (c), the motion is **DENIED**.

---

[13] To the extent that Petitioner faults defense counsel for not requesting an instruction that good character alone may generate reasonable doubt, counsel were not ineffective for refraining from making a futile request. *See Oken v. Corcoran*, 220 F.3d 259, 269–70 (4th Cir. 2000); *Brandt v. Wetzel*, No. 13-305, 2014 WL 2547771, at *22 (W.D. Pa. June 5, 2014).

### 5. *Judicial Bias*

In his fifth ground for relief, Petitioner argues that the trial court judge exhibited bias against Petitioner in front of the jury by making prejudicial statements toward him. (ECF No. 1 at 9). Petitioner's claim centers on the trial judge reprimanding him for using the same restroom as jurors or potential jurors during a break in jury selection while jurors or potential jurors were still present in the courtroom. Petitioner raised the issue of judicial bias in all four of his state habeas petitions. He specifically referenced the reprimand related to his use of the restroom in his second, third, and fourth state habeas petitions. Petitioner also submitted to the WVSCA a letter from Ms. Panucci, his trial counsel, indicating that the trial judge "admonished" Petitioner and defense counsel after Petitioner used the restroom in the public hallway outside of the courtroom. (ECF No. 24-6, Ex. 26 at 85). The WVSCA denied Petitioner's claim in its January 24, 2014 memorandum decision without explicitly discussing its merits. (ECF No. 16-1, Ex. 14 at 69).  In spite of its failure to provide an explanation for its reasoning, the WVSCA's summary dismissal of Petitioner's fourth state habeas was an adjudication on the merits.  *See Johnson*, 133 S.Ct. at 1096. Accordingly, the Court will apply AEDPA deference to the WVSCA's denial of Petitioner's judicial bias claim.

 Due process secures a criminal defendant's right to an impartial trial judge. *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)); *Montgomery v. Uchtman*, 426 F.3d 905, 910 (7th Cir. 2005) (citing same); *Layer v. Lyles*, 598 F. Supp. 95, 98 (D. Md. 1984). "The general presumption is that judges are honest and impartial." *Montgomery*, 426 F.3d at 910. In assessing judicial impartially, the Fourth Circuit has accepted that a judge is not merely a spectator at trial; rather, a judge must ensure that the presentations of counsel are not confusing to the jury and that trials do not become "protracted and

costly affairs," even if that means that the trial judge must interrupt counsel. *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006); *see also United States v. Ecklin*, 528 F. App'x 357, 362 (4th Cir. 2013). "'A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration' . . . do not establish bias or partiality." *United States v. Castner*, 50 F.3d 1267, 1274 (4th Cir. 1995) (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)). In addition, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible" *Liteky*, 510 U.S. at 555.[14] A trial judge's participation during trial, however, should "never reach the point at which it appears clear to the jury that the court believes the accused is guilty." *Ecklin*, 528 F. App'x at 362 (citations and markings omitted); *see also United States v. Bencivengo*, 749 F.3d 205, 216 (3d Cir. 2014). Ultimately, "[t]o prevail on a claim of judicial misconduct, [Petitioner] must show that the state trial judge's conduct was so fundamentally unfair as to deprive [him] of [his] constitutional right to due process," and this task is an onerous one. *Paccione v. New York*, 353 F. Supp. 2d 358, 368 (E.D.N.Y. 2005).

The Court finds that Petitioner cannot succeed on his judicial bias claim. The trial judge hardly exhibited any sign of bias against Petitioner or defense counsel throughout the trial. To the extent that the trial judge may have admonished Petitioner and his counsel about his use of the public restroom during jury selection, that admonishment is not captured by the record. Regardless, even taking Petitioner's description of the event as true, a single criticism of Petitioner and defense

---

[14] While *Liteky* concerned the federal recusal statute, federal courts have looked to it for guidance in resolving habeas claims of judicial bias. *See, e.g.*, *Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *22 (E.D. Mich. Oct. 24, 2007).

counsel that occurred before trial began and that was unrelated to the evidence of the case is plainly insufficient to establish judicial bias. *See United States v. Gomes*, 177 F.3d 76, 80 (1st Cir. 1999) (holding that trial court's rebuke of defense counsel in front of jury did not deprive defendant of fair trial where rebuke was directed at courtroom conduct and "carried no suggestion that the defense case was weak or that the judge sided with the prosecutor"); *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997) (recognizing that, in considering judicial bias or misconduct claim, court must "differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality, on the other hand."). In sum, the Court cannot conclude that the trial judge's "behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). For that reason, the WVSCA's decision denying Petitioner's judicial bias claim was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the Court **DENIES** Petitioner's fifth ground for relief and **GRANTS** Respondent's motion for summary judgment on ground five of Petitioner's § 2254 petition.

### *6. Character Jury Instruction*

Petitioner next argues in his sixth ground for relief that the trial court erred by failing to instruct the jury that character evidence alone could be sufficient to find Petitioner not guilty of the offenses with which he was charged. (ECF No. 1 at 10). Petitioner raised an identical claim in his fourth state habeas petition. In its January 2014 memorandum decision, the WVSCA denied the claim as not cognizable in state habeas proceedings. (ECF No. 16-1, Ex. 14 at 68). Although the claim may be procedurally defaulted, the Court chooses to deny it on the merits.

The Fourth Circuit has recognized that state trial court jury instructions are "matters of state law and procedure not involving federal constitutional issues, and are therefore not

reviewable in a federal habeas proceeding." *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1992) (internal quotations omitted), *abrogated on other grounds by Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999). A "federal court may grant habeas relief only when the challenged instruction 'by itself so infected the entire trial that the resulting conviction violates due process,' it is not enough that the instruction was undesirable, erroneous, or even universally condemned." *Nickerson*, 971 F.2d at 1137 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "[A]n omitted instruction is less likely to be prejudicial than a misstatement of the law, which means that a petitioner seeking habeas relief based on a trial court's failure to give a particular instruction has an 'especially heavy' burden of demonstrating that the failure to give the instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment." *Kellum v. Pierce*, 24 F. Supp. 3d 390, 404 (D. Del. 2014) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154–55 (1977)). "In determining whether a jury instruction, or lack of one, violated a defendant's due process rights, a reviewing court must make its determination in the context of the instructions as a whole and the trial record." *Blankenship v. Mitchell*, No. 1:05CV83-1-MU, 2006 WL 163619, at *3 (W.D.N.C. Jan. 20, 2006) (citing *Henderson*, 431 U.S. at 71).

As indicated previously, the WVSCA has held that "[a]n instruction which states or suggests that good character, standing alone, may generate reasonable doubt is erroneous." *Surbaugh*, 737 S.E.2d at 257. Petitioner has not cited any authority to suggest that the WVSCA's holding in *Surbaugh* contravenes any right under the United States Constitution. Moreover, Petitioner has offered no support for the proposition that he was entitled to a jury instruction on his good character under federal constitutional law. Finally, the Court concludes that the omission of a good character instruction did not render Petitioner's trial fundamentally unfair. *See Nickerson*, 971 F.2d at 1137; *Kellum*, 24 F. Supp. 3d at 404.  The trial court properly instructed

the jury on witness credibility and weighing evidence, including the testimony of Petitioner. The jury also heard character evidence favorable to Petitioner and was therefore able to consider it in their deliberations. Accordingly, the Court **DENIES** Petitioner's sixth ground for relief and **GRANTS** Respondent's motion for summary judgment on ground six of Petitioner's § 2254 petition.

### 7. *Discussions Held off of the Record*

In his seventh ground for relief, Petitioner claims that his right to a public trial was violated when parts of his trial were held off of the record. (ECF No. 1 at 11). Petitioner particularly takes issue with a discussion held off of the record prior to jury selection. (ECF No. 24-2, Ex. 17 at 11). He seemingly argues that the discussion concerns the later admonishment that he received from the trial court, described above in the judicial bias discussion. (ECF No. 1 at 11). Petitioner first raised this claim in his fourth state habeas petition. (ECF No. 16-1, Ex. 10 at 48). In its January 24, 2014 memorandum decision, the WVSCA found that this claim was not cognizable in a state habeas proceeding. (*Id.* at 68). As with other potentially procedurally defaulted claims discussed throughout this opinion, the Court addresses the merits of the claim rather than the more difficult procedural issues.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to a public trial. U.S. Const. amend. VI. Notwithstanding, Petitioner has failed to cite any authority for the proposition that holding discussions off of the record violates a defendant's right to a public trial. Indeed, at least one federal court has persuasively rejected a similar claim. *White v. Ryan*, No. CV-08-08139-PCT-SPL, 2015 WL 4173343, at *23–24 (D. Ariz. July 10, 2015) (finding that failure to record bench conferences during trial did not violate petitioner's right to public trial).  Another federal district court has denied a due process claim where the petitioner

averred that discussions held off of the record violated his right to a fair trial. *See Torres v. Scribner*, No. F 05-01479 LJO TEG HC, 2008 WL 5156630, at *25 (E.D. Cal. Dec. 9, 2008) (turning away petitioner's claim that he was denied a fair trial as a result of the number of sidebars and discussions held off of the record).

Here, Petitioner has neither alleged nor demonstrated that the discussions held off of the record during his trial were closed to the public or that the public was prevented from observing these exchanges. To the extent that any off-record discourse occurred during bench conferences, as other federal courts have recognized, bench conferences are a necessary part of trial management that do not infringe upon the right to a public trial. *See, e.g.*, *Brown v. Bergh*, No. 09-CV-14850, 2014 WL 2615372, at *13 (E.D. Mich. June 12, 2014) (stating that "side bar and in camera conferences are a commonplace occurrence during criminal trials that simply do not implicate the right to a public trial."). Furthermore, Petitioner only points to one discussion held off of the record that he believes was significant; yet, the import of that discussion is doubtful. The exchange occurred before potential jurors entered the courtroom, and the conversation immediately preceding the off-record discussion concerned how to organize the courtroom to accommodate the number of potential jurors. (ECF No. 24-2, Ex. 17 at 10). The discussion following the off-record exchange related to the health of a potential defense witness. (*Id.*) Thus, the context surrounding the off-record discussion demonstrates its lack of importance. Additionally, Petitioner has only guessed at the gravity of the off-record discussion. He speculates that it supports his judicial bias claim; however, it seems improbable that the off-record discussion would have related to the trial court's later admonishment of Petitioner because, at the time of the discussion, Petitioner had yet to offend the court by using the public restroom where jurors may have been present. Moreover, even in the very unlikely event that Petitioner's hunch is correct, the

discussion held off of the record did not relate to any substantive matter. Because Petitioner has failed to demonstrate that any off-record discussions in his case transgressed his right to a public trial, the Court **DENIES** Petitioner's seventh ground for relief and **GRANTS** Respondent's motion for summary judgment on ground seven of Petitioner's § 2254 petition.

### 8. *Ex Post Facto Claim*

Next, Petitioner contends in his eighth ground for relief that his sentence on Count Two (sexually abusing N.S. while acting as her parent, guardian, or custodian) violates the *Ex Post Facto* Clause. (ECF No. 1 at 12). Petitioner asserts that Count Two of the indictment charged him with sexually abusing N.S. while acting as her custodian within ten years of the issuance of the indictment, which would encompass conduct dating back to June 1997. (*Id.*) Petitioner also contends that N.S. testified the abuse began when she was five or six years old and that N.S. would have been six years old in June 1997. (*Id.*) Petitioner avers that the sexual abuse by a custodian statute, West Virginia Code § 61-8D-5, was amended in 1998 to increase the punishment for the offense, and he insists that he was sentenced under the amended version of the statute when his criminal conduct occurred before the amendment, resulting in an *ex post facto* violation. (*Id.*) In its January 24, 2014 memorandum decision, the WVSCA denied Petitioner's claim on the merits. (ECF No. 16-1, Ex. 14 at 68). The court reasoned that N.S.'s trial testimony did not sufficiently establish that the offenses began before § 61-8D-5 was amended. (*Id.*) Moreover, the court pointed out that N.S. testified Petitioner abused her between the ages of twelve and fourteen, and those actions would have occurred after the statute was amended. (*Id.*)

The Constitution prohibits the States from enacting any *ex post facto* law. U.S. Const. art. I, § 10. "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by

it, by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (citations and markings omitted). In other words, a law violates the *Ex Post Facto* Clause when: (1) the law punishes as a crime an act previously committed, which was innocent when done; (2) makes "more burdensome the punishment for a crime after its commission"; or (3) deprives the accused of "any defense available according to law" at the time when the act was committed." *Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925)).

To begin, Petitioner is correct that West Virginia Code § 61-8D-5 was amended in March 1998 to increase the punishment for sexual abuse by a custodian from five to fifteen years of imprisonment to ten to twenty years of imprisonment.  *See J.L. v. Ballard*, No. 12-0431, 2013 WL 2462197, at *17 (W. Va. June 7, 2013) (memorandum decision).    Count Two alleged that Petitioner "unlawfully and feloniously, did engage in and attempt to engage in an act of sexual intrusion with the said [N.S.], to-wit: penetration of the female sex organ of [N.S.] by the fingers of [Petitioner][.]"  (ECF No. 24-1, Ex. 15 at 1–2.)  Although N.S. stated that Petitioner began touching her genital area on top of her clothing when she was five or six years old, (ECF No. 24-2, Ex. 17 at 228), she testified that Petitioner did not penetrate her vagina with his finger until she was between twelve and fourteen years of age.  (*Id.* at 229.)  Because N.S. was born in 1990, Petitioner's conduct of digitally penetrating N.S. would have occurred between 2002 and 2004.  (*Id.* at 216).   This conduct took place well after § 61-8D-5 was amended in 1998.  Accordingly, the WVSCA's decision denying Petitioner's *ex post facto* claim was not contrary to, or an unreasonable application of, clearly established federal law.   Therefore, the Court **DENIES** Petitioner's eighth ground for relief and **GRANTS** Respondent's motion for summary judgment on ground eight of Petitioner's § 2254 petition.

### 9. The Trial Court's Refusal to Grant a Mistrial

Petitioner raises as his ninth ground for habeas relief that he was denied a fair trial when the trial court refused to grant a mistrial after B.S. testified about the alleged abuse of A.L.S. On the first day of trial, B.S. was questioned by the prosecuting attorney about her relationship with Petitioner and his wife. B.S. answered that she was no longer close to them, because Petitioner had hurt her and her two sisters.  When asked how Petitioner had hurt her, B.S. responded that Petitioner had molested her and her sisters, N.S. and A.L.S.  (ECF No. 24-2, Ex. 17 at 190). Given that the counts in the indictment pertaining to A.L.S. had been dismissed prior to trial, defense counsel immediately objected and requested a bench conference.  (*Id*. at 190–93). Counsel moved the court to declare a mistrial, arguing that the jury had heard prejudicial information about other alleged abuse that the jury was not permitted to hear. As an alternative, the prosecuting attorney urged the court to provide the jurors with a cautionary instruction, advising them to disregard any testimony by B.S. that was not based upon her personal knowledge. Defense counsel balked at the idea of an instruction, expressing concern that directly addressing the issue would only draw more attention to the improper testimony. After considering the arguments, the court concluded that the problem could be cured by limiting B.S.'s testimony to her personal knowledge and by providing a cautionary instruction, if necessary. (*Id*.)  The prosecutor then continued his examination of B.S. He began by confirming with her that she knew only about her own contacts with Petitioner. He subsequently proceeded to question her about those contacts. No other testimony was offered regarding A.L.S., and no curative instruction was given.

After his conviction, Petitioner appealed the trial court's refusal to grant a mistrial. Petitioner argued that he was denied a fair trial when the jurors heard evidence of other alleged "bad acts." According to Petitioner, B.S.'s testimony about A.L.S. clearly influenced the jurors'

assessment of Petitioner and "foreclosed the possibility of acquittal just moments after the State's case-in-chief began." (ECF No. 24-6, Ex. 25 at 49). The WVSCA disagreed, finding no evidence that the trial court acted in an arbitrary or irrational manner. Furthermore, the WVSCA did not believe the record supported Petitioner's assertion that the jury could not move past B.S.'s brief and unsolicited comment. The court observed that, over two days of trial, the State had offered "significant evidence of [Petitioner's] abhorrent behavior toward his two granddaughters." (*Id.* at 50). The court concluded that Petitioner had "failed to show manifest necessity for a mistrial as there [was] no evidence of prosecutorial overreaching." (*Id.* at 51).

In the instant petition, Petitioner again frames the issue as one of trial court error. However, "[i]t is important at the outset to define the question before [this Court]. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her [not] to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the [WVSCA] that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law.'" *Renico v. Lett*, 559 U.S. 766, 772–73 (2010) (citing § 2254(d)(1)).

It is well-established federal law that a trial judge has broad discretion to grant or deny a motion for a mistrial. *Illinois v. Somerville,* 410 U.S. 458, 462 (1973). "[T]he power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico*, 559 U.S. at 774 (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)). Nonetheless, because "[a] constitutionally protected interest is inevitably affected by any mistrial decision," the trial judge must exercise sound discretion in resolving the motion. *Arizona v. Washington*, 434 U.S. 497, 514 (1978); *see also Baum v. Rushton*, 572 F.3d 198, 217 (4th Cir. 2009) (noting that

the findings of the trial judge with regard to the propriety of granting a mistrial are entitled to deference and "cannot be overturned on . . . a flimsy basis").

The WVSCA conducted a thoughtful analysis of the trial court's decision, applying longstanding precedent to the facts of the case. The isolated comment by B.S. was not followed by any other testimony or evidence related to A.L.S. and the prosecutor made it clear that B.S. had no personal knowledge of any "bad acts" other than those of which she was the victim. Moreover, as the WVSCA emphasized, defense counsel refused a cautionary instruction. In any event, the essence of a curative instruction was communicated through the prosecuting attorney's follow-up questioning of B.S. and was repeated in the jury instructions when the jurors were told not to guess or speculate about the existence of facts not in evidence. (ECF No. 24-4, Ex. 19 at 16). Juries are presumed to follow the instructions given them by the trial judge. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Francisco*, 35 F.3d 116, 119 (4th Cir. 1994). For these reasons, the trial judge in this case can reasonably be said to have exercised sound discretion. The WVSCA's finding that the trial court did not err in refusing Petitioner's motion for a mistrial was not an unreasonable application of clearly established federal law. Therefore, the Court **DENIES** Petitioner's ninth ground for relief and **GRANTS** Respondent's motion for summary judgment on ground nine of Petitioner's § 2254 petition.

### 10. Actual Innocence

In his final ground for relief, Petitioner insists that he is actually innocent. (ECF No. 1 at 14). As Magistrate Judge Eifert noted in her March 25, 2015 Memorandum Opinion and Order:

> Free-standing claims of "actual innocence" are usually not recognized in federal habeas actions. *Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("A claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Schlup v. Delo,* 513 U.S. 298, 314–15 (1995). . . . [T]o the extent Petitioner raises a free-standing claim of actual innocence, such a claim

> has not been recognized by the United States Supreme Court outside of the capital
> context and thus is subject to dismissal on the merits . . . . 28 U.S.C. § 2254(b)(2).

(ECF No. 19 at 7–8) (footnote omitted); *see Dretke v. Haley*, 541 U.S. 386, 388–89 (2004) (declining to decide "whether [the actual innocence] exception applies where an applicant asserts 'actual innocence' of a noncapital sentence"). Even if the United States Supreme Court were to recognize a freestanding claim of actual innocence outside of the capital context, Petitioner could not succeed on such a claim. Given the testimony adduced at trial and summarized above, the Court finds that Petitioner cannot meet the "extraordinarily high" threshold for a freestanding actual innocence claim. *Herrera*, 506 U.S. at 417. Because his tenth ground for relief is not cognizable in habeas corpus, the Court **DENIES** Petitioner's tenth ground for relief and **GRANTS** Respondent's motion for summary judgment on ground ten of Petitioner's § 2254 petition.[15]

## IV.    Conclusion

For these reasons, the Court **GRANTS** Petitioner's Motion to Amend Original Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, (ECF No. 43), **GRANTS** Petitioner's request for an evidentiary hearing on his ineffective assistance of counsel claim related to the plea offer, (ECF No. 1 at 17), and **RE-REFERS** this case to Magistrate Judge Eifert to conduct the evidentiary hearing on that claim only. Magistrate Judge Eifert shall submit proposed findings of fact and recommendations as to the merits of that claim after the evidentiary hearing is held. The Court also **GRANTS IN PART** and **DENIES IN PART** Respondent's Motion for Summary Judgment, (ECF No. 24). Respondent's Motion for Summary Judgment is **GRANTED** with respect to all of Petitioner's claims except for Petitioner's ineffective assistance of counsel claim related to the plea offer contained in Ground Four, subsection (c), of Petitioner's § 2254 petition. As to that claim,

---

[15] To the extent that Petitioner's actual innocence claim may be unexhausted, the Court exercises its discretion to deny the claim on the merits. 28 U.S.C. § 2254(b)(2); *see also White v. Keller*, No. 1:10-CV-841, 2013 WL 791008, at *5 (M.D.N.C. Mar. 4, 2013).

summary judgment is **DENIED**.  With the exception of Ground Four, subsection (c), Petitioner's claims contained in his § 2254 petition are **DENIED** and **DISMISSED**.

      **IT IS SO ORDERED.**

      The Court **DIRECTS** the Clerk to send a copy of this Order to Magistrate Judge Eifert, counsel of record, and any unrepresented party.

             ENTER:      March 31, 2016

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE